# In the United States Court of Federal Claims

No. 08-848C
Filed: August 4, 2011

|  |  |
|---|---|
| ) | |
| LUMMI TRIBE OF THE LUMMI RESERVATION, LUMMI NATION HOUSING AUTHORITY, FORT PECK HOUSING AUTHORITY, FORT BERTHOLD HOUSING AUTHORITY, AND HOPI TRIBAL HOUSING AUTHORITY, | Claims for recovery of grant funds under the Native American Housing Assistance and Self-Determination Act, 25 U.S.C. §§ 4101–4212: (1) effect of pendency of claims in another court under 28 U.S.C. § 1500; (2) jurisdiction of the Court of Federal Claims under a money-mandating source of law; (3) authority to declare a regulation invalid; (4) application of 25 U.S.C. § 4161; (5) application of the Anti-Deficiency Act, 31 U.S.C. § 1341; (6) operation of the statute of limitations under 28 U.S.C. § 2501. |

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

John Fredericks, III, Fredericks Peebles & Morgan LLP, Mandan, ND, counsel for plaintiffs.

Michael N. O'Connell, with whom were Assistant Attorney General Tony West, Director Jeanne E. Davidson, and Assistant Director Donald E. Kinner, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, counsel for defendant.

## OPINION

WIESE, Judge.

This action is one of a dozen or more law suits currently pending before both this court and the United States District Court for the District of Colorado brought by various Indian tribes and tribal housing authorities to challenge actions by the United States Department of Housing and Urban Development ("HUD") in calculating and seeking the repayment of grant funds paid to the tribes pursuant to the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"), as amended, 25 U.S.C. §§ 4101–4212 (2006). In particular,

plaintiffs in this case contend that HUD improperly determined that certain of plaintiffs' housing units could not be included in their grant calculations, thereby depriving plaintiffs of funding to which they allegedly were entitled both under the payment mandates of NAHASDA and under their annual funding agreements.

Defendant has moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.  The parties have fully briefed the issues and the court heard oral argument on May 19, 2011.[1]  For the reasons set forth below, defendant's motion to dismiss is granted in part and denied in part.

## BACKGROUND

Since the late 1930s, the United States has provided housing assistance to Indian tribes and their members through the United States Housing Act of 1937, 42 U.S.C. §§ 1437–1437x (1994), a statute authorizing various housing programs on Indian lands to meet the home-ownership needs of low-income Indian families.  In 1996, however, Congress enacted NAHASDA in an effort to consolidate low-income housing assistance for the tribes and to simplify the distribution of funds.  Beginning on September 30, 1997, NAHASDA terminated the Indian housing assistance established under the 1937 Housing Act and provided in its place a system of annual block grants.  25 U.S.C. §§ 4181, 4182.  The program anticipated that Congress would make an annual appropriation of grant funds, which the Secretary of HUD, acting through HUD's Office of Native American Programs, was in turn directed to divide among qualifying tribes and tribal housing authorities based on yearly housing plans submitted by the tribes.  25 U.S.C. § 4111.  Funds not disbursed in the year they were appropriated were to be rolled over for distribution in the following year.

Pursuant to NAHASDA, HUD was charged with establishing a grant-allocation formula through the agency's negotiated rule-making procedure.  25 U.S.C. §§ 4151, 4152, 4116.  Congress specified, however, that the allocation formula should reflect the needs of the Indian tribes, including: "(1) The number of low-income housing dwelling units owned or operated at the time pursuant to a contract between an Indian housing authority for the tribe and the Secretary.  (2) The extent of poverty and economic distress and the number of Indian families within Indian areas of the tribe.  (3) Other objectively measurable conditions as the Secretary and the Indian tribes may specify."  25 U.S.C. § 4152(b).

---

[1]  Following oral argument, the court gave the parties an opportunity to supplement their briefs to address an issue raised by defendant for the first time during its oral presentation.  This supplementary briefing was completed on June 10, 2011.

Pursuant to this statutory directive, a committee made up of HUD employees and representatives from 48 Indian tribes developed guidelines for implementing NAHASDA. See "Implementation of the Native American Housing Assistance and Self-Determination Act of 1996; Final Rule," 63 Fed. Reg. 12,334 (Mar. 12, 1998). The resulting regulations, found at 24 C.F.R. §§ 1000.301–1000.340, identified two components for calculating the grant amount each tribe would receive.  The first component, referred to as Formula Current Assisted Stock ("FCAS"), measured the inventory of rental units and lease-to-own units owned by each tribe as of September 30, 1997 (the effective date of NAHASDA).[2]  Grant funds not distributed under this first component were then allocated on the basis of the second component: the tribe's need.[3]  As a result, the greater the number of FCAS units reported, the fewer the funds that would be distributed based on need.

Plaintiffs received NAHASDA housing grants annually from 1998 through 2009.  In 2001, however, HUD's Office of Inspector General ("OIG") performed a nationwide audit of the NAHASDA program.  The OIG audit report concluded that the program's funds had not been properly allocated in previous years because the grant allocations were based on "housing units that do not qualify as FCAS."  Fort Peck Housing Auth. v. United States Dep't of Housing and Urban Dev., 435 F. Supp. 2d 1125, 1130 (D. Colo. 2006) (Fort Peck I).  In particular, the report criticized HUD for failing to enforce 24 C.F.R. § 1000.318, a regulation specifying that housing units would no longer be considered FCAS "when the Indian tribe . . . no longer has the legal right to own, operate, or maintain the unit" so long as such units are conveyed "as soon as practicable after a unit becomes eligible for conveyance."[4]  As the OIG

---

[2]  Under the previous housing regime, Indian tribes had administered two lease-to-own programs, referred to as the "Mutual Help" and "Turnkey III" programs, to assist tribe members in securing long-term and/or permanent housing.  24 C.F.R. §§ 1000.314, 1000.318.  In general, Indian families agreed to contribute land, work, cash, or materials and equipment for the construction of a home in exchange for a lease-to-own arrangement for a term of up to 25 years.  24 C.F.R. pt. 905, subpts. E and G (1995);  Dewakuku v. Martinez, 271 F.3d 1031, 1034–35 (Fed. Cir. 2001).

[3]  The need component of the allocation formula is based on seven criteria, including information derived from census data such as the number of households in a tribe's population with incomes below a median-income level and the number of households without kitchens or plumbing.  Fort Peck Housing Auth. v. United States Dep't of Housing and Urban Dev., 367 Fed. App'x 884, 886 n.7 (10th Cir.), cert. denied, ___ U.S. ___, 131 S. Ct. 347 (2010).

[4]  Addressing the question of when units under the FCAS criterion "cease to (continued...)

explained in its report, "[s]ince Mutual Help and Turnkey III programs generally do not exceed 25-years, one can reasonably expect that some of these units should be paid-off, and the Housing Entities would no longer have the legal right to own, operate, or maintain these units." Id.  The OIG recommended that HUD's Office of Native American Programs "audit all Housing Entities' FCAS, remove ineligible units from FCAS, recover funding from Housing Entities that had inflated FCAS and reallocate the recovery to recipients that were under funded" and "institute control procedures to insure FCAS accuracy for future years." Id.

Consistent with the OIG's conclusions, HUD notified various tribes and tribal housing authorities of its intention to recapture overpaid grant funds.  By letter dated September 14, 2000, for instance, HUD informed the Lummi Tribe that the tribe had "incorrectly received credit in Fiscal Years (FY) 1998, 1999, and 2000" for Mutual Help units under the FCAS component of the grant formula and had consequently been given $1,279,748 more in grant funds than it should have received.  The letter indicated that HUD would account for the overfunding by adjusting the tribe's fiscal year 2001 grant.  A second letter from HUD to the Lummi Tribe, dated June 21, 2001, confirmed that the tribe and the agency had reached an agreement requiring the Lummi Tribe to return $1,279,748 in overpaid grant funds.

Fort Peck Housing Authority received a similar letter from HUD on September 21, 2001, indicating that the housing authority may have received overfunding for fiscal years 1998 through 2001.  The letter informed Fort Peck that

---

[4](...continued)
be counted or expire from the inventory used for the formula," 24 C.F.R. § 1000.318 provides in relevant part as follows:

> (a)  Mutual Help and Turnkey III units shall no longer be considered Formula Current Assisted Stock when the Indian tribe . . . no longer has the legal right to own, operate, or maintain the unit, whether such right is lost by conveyance, demolition, or otherwise, provided that:
>
>> (1) Conveyance of each Mutual Help or Turnkey III unit occurs as soon as practicable after a unit becomes eligible for conveyance by the terms of the MHOA [Mutual Help Occupancy Agreement]; and
>>
>> (2) The Indian tribe . . . actively enforce[s] strict compliance by the homebuyer with the terms and conditions of the MHOA, including the requirements for full and timely payment.

HUD would "need to recover these funds if it is determined that the Fort Peck Assiniboine and Sioux Tribe received funding for ineligible units in past years." Following the receipt of additional information from Fort Peck, HUD notified the housing authority on December 20, 2001, that it had received $1,298,354 in overfunding for fiscal years 1998 through 2000. In a second letter dated May 30, 2002, HUD further informed Fort Peck that the housing authority owed an additional $468,922. The record indicates that by July 1, 2002, Fort Peck had repaid $513,354 of that amount.[5]

On January 6, 2005, Fort Peck filed an action in the United States District Court for the District of Colorado pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. Fort Peck I, 435 F. Supp. 2d 1125. Fort Peck sought a declaration that HUD had acted unlawfully in reducing the FCAS component of its grant funding for the years 1999 through 2002 and an injunction prohibiting HUD from recovering those grant amounts. In a decision dated May 25, 2006, the district court found in Fort Peck's favor and ruled that the regulation setting out the allocation formula, 24 C.F.R. § 1000.318, conflicted with the plain language of NAHASDA. Id. at 1135. In particular, the court observed that the statute required HUD to include in the allocation formula "[t]he number of low-income housing dwelling units owned or operated" by a tribe as of September 30, 1997, creating what the court described as a baseline, or floor, for funding at the level of 1997 housing units. That mandate, in the court's view, was not incorporated into section 1000.318, thus rendering the regulation invalid. Id. at 1132. The court thus ordered that all applicable units owned by Fort Peck as of September 30, 1997, be included in HUD's calculation of its housing block grants and directed HUD to take such administrative action as necessary to implement the court's ruling.

On June 9, 2006, Fort Peck moved to alter or amend the judgment pursuant to Fed. R. Civ. P. 59(e) to require a refund of the $513,354 it had repaid to HUD for fiscal years 1998 through 2002. In an unpublished order dated August 1, 2006, the court denied the requested monetary relief. Fort Peck Housing Auth. v. United States Dep't of Housing and Urban Dev., 2006 WL 2192043 (D. Colo. Aug. 1, 2006). The court observed that the grant funds that Fort Peck had returned to HUD in 2002 had been treated as unobligated funds and therefore were divided among the participating

---

[5] Although the record does not indicate whether the other two plaintiffs in this action—Fort Berthold Housing Authority and Hopi Tribal Housing Authority—also received overpayment notices from HUD, we assume that such was the case given the reference included in each tribe's "Fiscal Year (FY) 2000 Indian Housing Block Grant Allocation & Formula Data" (a HUD-provided annual allocation summary sheet) showing a downward adjustment in the fiscal year 2000 grant allocation based on "FY 1998 and FY 1999 Adjustments (see accompanying cover letter)."

Indian tribes the following year as part of the distribution of grant funds appropriated for fiscal year 2003.  Id. at *1.  No funds, in other words, remained to satisfy Fort Peck's claim.  Given that reality, the district court found that any payment of the requested amount would have to come from a source other than the appropriations made for the fiscal years in question.  The court accordingly concluded that:  (1) the claim was moot because the court, following the redistribution of the repaid sums, could no longer grant specific relief under the APA (i.e., a return of the particular funds); and (2) the court had no authority under section 702 of the APA to provide "money damages" or other "substitute relief."  Id. at *2.

On appeal, the Tenth Circuit reversed.  In an unpublished decision dated February 19, 2010, the Tenth Circuit observed that courts, in reviewing agency rulemaking, generally accord great deference when the challenged action involves matters within the agency's area of expertise.  Fort Peck Housing Auth. v. United States Dep't of Housing and Urban Dev., 367 Fed. App'x 884, 892 (10th Cir.), cert. denied, ___ U.S. ___, 131 S. Ct. 347 (2010) (Fort Peck II).  The allocation of funds for low-income housing assistance, the court concluded, was "certainly" within HUD's area of expertise.  Id.  The court went on to reject the district court's conclusion that 24 C.F.R § 1000.318 was invalid, finding that the allocation formula indeed complied with NAHASDA's requirement that the formula be related to the need of the Indian housing entities.  Id.  As the Tenth Circuit explained, HUD "clearly included the entire [25 U.S.C. § 4152](b)(1) factor [requiring that the "number of low-income housing dwelling units owned or operated" by the tribe as of September 30, 1997, be included in the formula determining need] as the starting point," then provided for a "reduction equal to the number of dwelling units no longer owned or operated by a Tribal Housing Entity."  Id.  The court held that this downward adjustment "recognized the ongoing and evolving needs of Tribal Housing Entities" and was not "arbitrary and capricious."  Id.  Finally, the court dismissed Fort Peck's cross-appeal for return of its overfunding repayments, indicating that the appeal was moot because HUD's actions did not violate NAHASDA.  Id. at 892 & n.15.

On remand, the district court consolidated Fort Peck's suit with the other NAHASDA cases pending before it and ordered the parties to file amended or supplemental complaints.  Fort Peck complied with the court's order on September 7, 2010; its case remains pending.  The other plaintiffs in this action, however, have not filed suit in the district court.

Following the district court's decision in Fort Peck I but prior to the Tenth Circuit's reversal in Fort Peck II, Congress enacted the Native American Housing Assistance and Self-Determination Reauthorization Act of 2008, Pub. L. No. 110-411, 122 Stat. 4319 (the "Reauthorization Act of 2008 ") on October 14, 2008. Section 301(2) of the Reauthorization Act of 2008 amended section 4152(b) of

NAHASDA by essentially adopting the provisions in regulation 24 C.F.R. § 1000.318, specifying that housing units are to become ineligible for inclusion in FCAS when a tribe no longer owns the units.  In particular, section 301(2) provides as follows:

> **(b) Factors for determination of need**
>
> The formula shall be based on factors that reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities, including the following factors:
>
>> **(1)(A)** The number of low-income housing dwelling units developed under the United States Housing Act of 1937 (42 U.S.C. 1437 et seq.), pursuant to a contract between an indian housing authority for the tribe and the Secretary, that are owned or operated by a recipient on the October 1 of the calendar year immediately preceding the year for which funds are provided, subject to the condition that such a unit shall not be considered to be a low-income housing dwelling unit for purposes of this section if—
>>> **(i)** the recipient ceases to possess the legal right to own, operate, or maintain the unit; or
>>> **(ii)** the unit is lost to the recipient by conveyance, demolition, or other means.
>>
>> **(B)** If the unit is a homeownership unit not conveyed within 25 years from the date of full availability, the recipient shall not be considered to have lost the legal right to own, operate, or maintain the unit if the unit has not been conveyed to the homebuyer for reasons beyond the control of the recipient.

25 U.S.C. § 4152.

The Reauthorization Act of 2008 specified, however, that these amendments did "not apply to any claim arising from a formula current assisted stock calculation or count involving an Indian housing block grant allocation for any fiscal year through fiscal year 2008, if a civil action relating to the claim is filed by not later than 45 days after October 14, 2008." 25 U.S.C. § 4152(b)(1)(E).  Accordingly, Indian tribes wishing to pursue claims based on the previous version of the statute and 24 C.F.R. § 1000.318 were required to file suit by November 28, 2008.  Plaintiffs filed suit in this court on November 26, 2008.

DISCUSSION

At the center of the parties' dispute is a regulation, 24 C.F.R. § 1000.318, that identifies when individual lease-to-own housing units may no longer be counted as part of FCAS in determining grant allocations.  At issue is whether HUD was permitted under NAHASDA to exclude from FCAS units owned or operated by the tribes as of September 30, 1997, that were later conveyed—or should have been conveyed—to eligible Indian families under the Mutual Help and Turnkey III programs (as is anticipated by the regulation) or whether NAHASDA, prior to its amendment, required that such units be permanently included in FCAS, setting a floor for FCAS funding at the 1997 level.  The resolution of this issue affects all tribes participating in the program; if one tribe obtains a larger block grant, another tribe (or tribes) receives a smaller grant or grants by exactly the same amount.  As defendant observed in its reply brief, "[t]his is a zero sum game, and all of the players are Indians."

Plaintiffs challenge HUD's actions on essentially three grounds.  First, plaintiffs argue that HUD unlawfully recaptured their grant funds in violation of both 25 U.S.C. § 4152(b)(1) and their funding agreements with the agency.  Second, plaintiffs maintain that HUD committed various statutory violations, including the failure to afford plaintiffs the notice and hearing rights set out in 25 U.S.C. §§ 4161 and 4165 before adjusting plaintiffs' grant allocations.  Finally, plaintiffs contend that HUD breached its trust and/or fiduciary duty to plaintiffs arising under NAHASDA and under the United States' relationship with Indian tribes more generally.  In each instance, plaintiffs seek "damages to compensate them for their losses" in an amount they identify as "no less than 1.6 million dollars per Plaintiff."

Defendant opposes plaintiffs' suit on multiple grounds.  First, defendant argues that this court is prohibited under 28 U.S.C. § 1500 from exercising jurisdiction over a claim if the same claim is pending against the United States in another forum at the time the complaint is filed here.  Defendant thus maintains that Fort Peck Housing Authority is not properly before this court because it had a virtually identical claim pending before the district court on November 26, 2008, the date the instant complaint was filed.  In the alternative, defendant contends that even if Fort Peck is properly before this court, its present claims were decided against it by the Tenth Circuit in Fort Peck II, 367 Fed. App'x 884, and that it is barred, under the doctrine of res judicata, from relitigating those issues here.

Nor, in defendant's view, have the remaining plaintiffs asserted a legitimate basis on which this court may exercise jurisdiction.  Defendant contends that NAHASDA, as a grant-in-aid program, does not mandate the payment of money for its violation and on that ground, the court is without jurisdiction to grant relief.  Similarly, defendant maintains that plaintiffs have failed to prove either the existence

8

of a trust relationship or the breach of specific fiduciary duties sufficient to confer jurisdiction on this court. Indeed, defendant argues that plaintiffs' claims, if they may be heard at all, must be heard by a court of appeals pursuant to 25 U.S.C. § 4161.

Even if this court is found to possess jurisdiction over plaintiffs' claims, however, defendant argues in the alternative that we are nevertheless barred from providing relief. Defendant contends that this is true in the first instance because plaintiffs' entitlement to damages is necessarily contingent on a declaration that 24 C.F.R. § 1000.318 is invalid—an equitable remedy defendant asserts is unavailable in this court. And it is true in the second instance, defendant maintains, because the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A), precludes recovery where, as here, the funds in dispute have already been distributed to other grant recipients, rendering plaintiffs' action moot. Finally, defendant maintains that plaintiffs' claims relating to fiscal years 1998 through 2002 are time-barred because they accrued more than six years before plaintiffs filed suit and thus fall outside this court's six-year statute of limitations period identified in 28 U.S.C. § 2501. We address these arguments in turn below.

### I. Fort Peck Housing Authority

28 U.S.C. § 1500, titled "Pendency of claims in other courts," provides as follows:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

As the Supreme Court recently observed in United States v. Tohono O'Odham Nation, ___ U.S. ___, 131 S. Ct. 1723, 1729–30 (2011), section 1500 "effects a significant jurisdictional limitation" on this court, designed to "save the Government from burdens of redundant litigation." Pursuant to section 1500, a claim is barred in this court when the action pending in the district court is based on substantially the same operative facts. Id. at 1731. In applying this jurisdictional bar, the court must focus on "the state of things at the time of the action brought." Keene Corp. v. United States, 508 U.S. 200, 207 (1993).

A review of the complaints filed by Fort Peck in this court and in the district court makes clear that its present suit is based on substantially the same operative

facts as the district court action.  In both its January 5, 2005, complaint before the district court and its November 26, 2008, complaint in this court, Fort Peck asserts that the government was required under NAHASDA to include in the funding formula all housing units owned by the housing authority on September 30, 1997, and that HUD's failure to do so resulted in the improper recapture of grant funds.  As the Court observed in <u>Tohono</u>, such a "substantial overlap in operative facts" precludes jurisdiction in the Court of Federal Claims.  <u>Tohono</u>, 131 S. Ct. at 1731.

Fort Peck argues, however, that its claim for money damages is not barred by section 1500 because that claim was no longer "pending in any other court" on the date Fort Peck filed suit in this court.  In support of this argument, Fort Peck cites <u>Young v. United States</u>, 60 Fed. Cl. 418, 425 (2004), for the proposition that a suit is no longer pending for purposes of section 1500 once it has been dismissed by the trial court but before the judgment has been appealed.  In Fort Peck's view, its refund claim before the district court reached its final resolution on August 1, 2006, when the district court denied its post-judgment motion for monetary relief.  <u>Fort Peck</u>, 2006 WL 2192043, at *2.  Fort Peck thus maintains that its action for damages in this court—filed after the district court's dismissal and in the only forum with jurisdiction to award the relief sought—is properly before this court.

This court considered and rejected such an assertion in <u>Jachetta v. United States</u>, 94 Fed. Cl. 277, 283 (2010).  In <u>Jachetta</u>, the court concluded that a claim remains pending for the purposes of section 1500 "until its final adjudication on appeal or until the time for appeal has run."  <u>Id.</u>  The court explained its reasoning as follows:

> By commencing a suit in the district court, plaintiff engaged a process that carries with it a right to an appeal.  <u>Alaska Packers Ass'n v. Pillsbury</u>, 301 U.S. 174, 177 (1937) (observing that "an appeal in a proper case is matter of right").  So long as that right remains exercisable, the process of which it is a part is properly regarded as pending.  To read section 1500 in the narrower sense that plaintiff urges—<u>i.e.</u>, to regard a suit as pending only when its merits are under active consideration by a court—is to deny the United States the full protections afforded by the statute by allowing a plaintiff to postpone an appeal until after the filing of the same cause of action in this court. That is, of course, the situation present here. We do not believe, however, that Congress could possibly have intended section 1500's reach to be so easily evaded by a litigant's strategic filing.  [<u>UNR Industries, Inc. v. United States</u>, 962 F.2d 1013, 1022 (Fed. Cir. 1992)] (observing that "Congress wanted not to dictate the order in which a claimant files suits in the Claims Court and another court on the same claim, but to discourage him from doing so altogether").  In

accordance, then, with the definition of the term "pending" adopted in [Carey v. Saffold, 536 U.S. 214 (2002)], we hold that a suit is pending for purposes of section 1500 until its final adjudication on appeal or until the time for appeal has run.

Id.

The court stands by this reasoning, even where, as here, Fort Peck contends that the particular issue—its claim for money damages—had been fully resolved by the district court at the time the instant complaint was filed. The important fact is that the district court judgment was subsequently the subject of an appeal and that that action—based on substantially similar if not identical facts to the instant case—remains ongoing. It is no answer to say, as Fort Peck does, that Fort Peck sought an appeal on different grounds and that its damages claim can somehow be carved out to be considered separately.[6] As the Tohono Court made clear, the burden that section 1500 seeks to avoid is the simultaneous defense of substantially similar suits without regard to the relief sought. Tohono, 131 S. Ct. at 1731 (clarifying that "[t]wo suits are for or in respect to the same claim, precluding jurisdiction in the [Court of Federal Claims], if they are based on substantially the same operative facts, regardless of the relief sought in each suit."). Fort Peck's claims accordingly must be dismissed from this case pursuant to 28 U.S.C. § 1500.[7]

II. The Remaining Plaintiffs

A. Exercising Jurisdiction Under NAHASDA's Money Mandate

---

[6] Although Fort Peck acknowledges that it appealed the denial of its post-judgment motion for damages to the Tenth Circuit, it contends that it did so on the ground that the district court could have granted equitable relief (i.e., in the form of an upward adjustment of future grant awards) and that it did not challenge the district court's determination that it had no authority to provide monetary relief.

[7] Because Fort Peck is not properly before this court, we need not determine whether all of the issues it attempts to assert here have been disposed of by the Tenth Circuit (and are thus binding on Fort Peck under the doctrine of res judicata) or whether any issue remains to be adjudicated. In any event, the remaining four plaintiffs were not parties in the district court litigation (nor were their interests represented there) and therefore they are not barred by the Tenth Circuit's decision.

The Tucker Act, 28 U.S.C. § 1491, authorizes this court to exercise jurisdiction over claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." As this court explained in the seminal case Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007 (Ct. Cl. 1967), however, "it is not every claim involving or invoking the Constitution, a federal statute, or a regulation which is cognizable here." Accord United States v. Mitchell, 463 U.S. 206, 217 (1983). Rather, for jurisdictional purposes, a claim should be construed as "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department," only where the "source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." Mitchell, 463 U.S. at 218.[8] Plaintiffs contend that NAHASDA provides such a money mandate.

Section 4111 of NAHASDA, titled "Block grants" provides as follows:

**(a) Authority**

    **(1) In general**

        For each fiscal year, the Secretary shall (to the extent amounts are made available to carry out this chapter) make grants under this section on behalf of Indian tribes—

---

[8] Other courts have suggested that this traditional test for whether a statute is money mandating for the purposes of establishing Tucker Act jurisdiction was altered by the Supreme Court in United States v. White Mountain Apache Tribe, 537 U.S. 465, 472–73 (2003), in which the majority declared that it was "enough . . . that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages." See, e.g., White Mountain, 537 U.S. at 487 (Thomas, J., dissenting) (asserting that the majority has "fashion[ed] a new test to determine whether Congress has conferred a substantive right enforceable against the United States in a suit for money damages"); Fisher v. United States, 402 F.3d 1167, 1174 (Fed. Cir. 2005) ("Whether White Mountain alters the Mitchell test, as suggested by the dissent in White Mountain, and whether the new test is less stringent in some respects or is the same, as suggested by the concurrence, is less than clear. Future opinions by the Supreme Court may clarify all this.") Whether or not the Court's language in White Mountain in some way modifies the traditional rule, however, we do not read that decision as changing the fundamental premise that a statute is money mandating where it creates an unqualified entitlement to payment. Where such an entitlement exists, a remedy is necessarily available in this court.

>    **(A)** to carry out affordable housing activities under part A of subchapter II of this chapter; and

>    **(B)** to carry out self-determined housing activities for tribal communities programs under part B of that subchapter.

25 U.S.C. § 4111.  Section 4151, titled "Annual allocation," in turn provides as follows:

>    For each fiscal year, the Secretary shall allocate any amounts made available for assistance under this chapter for the fiscal year, in accordance with the formula established pursuant to section 4152 of this title, among Indian tribes that comply with the requirements under this chapter for a grant under this chapter.

25 U.S.C. § 4151.

In plaintiffs' view, NAHASDA is money mandating because it leaves no room for HUD to exercise discretion in making grants. This court agrees. "In general, a statute will be deemed to be a money-mandating source of law if it compels the government to make a payment to an identified party or group." ARRA Energy Co. I v. United States, 97 Fed. Cl. 12, 19 (2011) (citing Eastport, 372 F.2d at 1009 ("Under Section 1491 what one must always ask is whether the constitutional clause or the legislation which the claimant cites can be fairly interpreted as mandating compensation by the Federal Government for the damage sustained.")); see also Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005) (observing that "where the statutory text leaves the government no discretion over payment of claimed funds[,]" Congress has provided a money-mandating source for jurisdiction in this court); Grav v. United States, 886 F.2d 1305, 1307 (Fed. Cir. 1989) (characterizing a statute as money mandating for the purposes of Tucker Act jurisdiction where the Secretary had no discretion to prevent a qualified applicant from participating in the statutory program).

As indicated above, NAHASDA provides that the Secretary "shall . . . make grants" and "shall allocate any amounts" among Indian tribes that comply with certain requirements, 25 U.S.C. §§ 4111, 4151 (emphasis added), and directs that the funding allocation be made pursuant to a particular formula, 25 U.S.C. § 4152. The Secretary is thus bound by the statute to pay a qualifying tribe the amount to which it is entitled under the formula. NAHASDA, in other words, can fairly be interpreted as mandating the payment of compensation by the government. Eastport, 372 F.2d at 1009. Such mandatory language is sufficient to confer jurisdiction on this court. Greenlee Cnty. v. United States, 487 F.3d 871, 877 (Fed. Cir. 2007) (observing that the Federal Circuit has "repeatedly recognized that the use of the word 'shall'

13

generally makes a statute money-mandating" (quoting <u>Agwiak v. United States</u>, 347 F.3d 1375, 1380 (Fed. Cir. 2003)); <u>Wolfchild v. United States</u>, 96 Fed. Cl. 302, 339 (2010) ("[c]onsistent use of the word 'shall' throughout the statute favors a finding that the [statute is] money-mandating").[9]

Defendant argues, however, that this case is governed by the Supreme Court's decision in <u>Bowen v. Massachusetts</u>, 487 U.S. 879 (1988), which it cites for the proposition that statutes should not be construed as money mandating where they subsidize future expenditures (as through grants) rather than compensate for "past injuries or labors." <u>Id.</u> at 905 n.42. Statutes in the former category, defendant argues, confer no jurisdiction on this court. Defendant thus maintains that plaintiffs' claims—seeking money intended to subsidize the tribes' future expenditures rather than to compensate the tribes for "past injuries or labors"—should be dismissed as falling outside this court's jurisdiction.

We do not read <u>Bowen</u> as supporting the result defendant suggests. In <u>Bowen</u>, the Supreme Court addressed the issue of whether a state could assert a cause of action in a district court seeking monetary relief (the reimbursement of Medicaid expenses) where the basis for the court's jurisdiction—the Administrative Procedure Act—explicitly limits the district court's jurisdiction to suits that do not seek "money damages," 5 U.S.C. § 702, and to situations where "no other adequate remedy" is available in another forum, 5 U.S.C. § 704. The Secretary of Health and Human Services (the defendant in the case) argued that such a claim for reimbursement constituted a claim for damages and therefore could be heard only in the United States Claims Court (this court's predecessor). <u>Id.</u> at 890. The Commonwealth of Massachusetts (the plaintiff) contended instead that the claim sought specific performance—<u>i.e.</u>, the payment of particular funds—rather than money damages and thus was properly before the district court under the APA. The Court thus took up two inquiries that are relevant here: first, whether the relief sought—the enforcement of a statute (section § 1396b(a) of the Medicaid Act which provided that the Secretary "shall pay" certain amounts for appropriate Medicaid services)—constituted "money damages" as that term is used in section 702 of the APA; and second, whether an "adequate remedy" existed in another court as envisioned by section 704 of the APA.

---

[9] The Federal Circuit has recognized that this court may also exercise jurisdiction over certain discretionary payment schemes, including those entitlement statutes "(1) that provide 'clear standards for paying' money to recipients; (2) that state the 'precise amounts' that must be paid; or (3) as interpreted, compel payment on satisfaction of certain conditions." <u>Samish</u>, 419 F.3d at 1364. Although we find that the Secretary possessed no discretion in the implementation of the responsibilities under NAHASDA, we conclude in the alternative that the statute satisfies this lesser test for the exercise of this court's jurisdiction.

With respect to the first inquiry, the <u>Bowen</u> Court concluded that a Medicaid disallowance claim was "not a suit seeking money in compensation for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it [was] a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." <u>Id.</u> at 900. With respect to the second inquiry, the Court further concluded that an adequate remedy was not available in the Court of Federal Claims because relief in this court was limited (<u>i.e.</u>, the court could only enter a money judgment and not prospective, declaratory relief) and our jurisdiction over a Medicaid disallowance claim was "at least doubtful." <u>Id.</u> at 905.[10] The Court ultimately concluded that neither section 702 nor section 704 served as a bar to the district court's exercising jurisdiction over the claim.

Defendant reads these two conclusions as circumscribing this court's jurisdiction over claims that seek the enforcement of a statute or regulation generally, and over claims that seek the review of a grant program in particular. <u>See, e.g.</u>, <u>Katz v. Cisneros</u>, 16 F.3d 1204, 1207–09 (Fed. Cir.1994) (concluding that "no relief is available in the Court of Federal Claims" where the plaintiff seeks payments to which it claims entitlement under a federal statute and regulations and thus seeks the judicial interpretation of a federal regulation rather than "money as compensation for a loss suffered"); <u>Samish Indian Nation v. United States</u>, 90 Fed. Cl. 122, 132–33 (2009) (relying on the Supreme Court's "unambiguous statement in <u>Bowen</u> that 'the statutory mandate of a federal grant-in-aid program directs the Secretary to pay money to the State, not as compensation for a past wrong, but to subsidize future state expenditures'" to conclude that "statutes creating federal grant-in-aid programs are not designed to provide for a damages remedy" and do not therefore provide jurisdiction in this court). We reject both positions.

As an initial matter, the <u>Bowen</u> Court does not purport to define the limits of this court's jurisdiction—an issue not then before it—but rather to ascertain the limits of the district court's jurisdiction under the APA. This court is thus reluctant to

---

[10] The <u>Bowen</u> Court observed that this court may not grant relief while the funds are on the "State's side of the ledger" nor "act in any fashion so long as the Federal Government has not yet offset the disallowed amount from a future payment." <u>Id.</u> at 907. The Court additionally questioned whether this court could exercise jurisdiction "[g]iven the fact that the quarterly payments of federal money are actually advances against expenses that have not yet been incurred by the State," thus making it "arguable that a dispute concerning the status of the open account is not one in which the State can claim an entitlement to a specific sum of money that the Federal Government owes to it." <u>Id.</u> The thrust of these observations is that a claim, in order to be cognizable in this court, must be one for money presently owing. <u>Nat'l Air Traffic Controllers Ass'n v. United States</u>, 160 F.3d 714, 716 (Fed. Cir. 1998).

extend statements made in that context to divest this court of its traditional jurisdiction over claims arising under a money-mandating statute. Such reluctance is particularly warranted, we believe, since this court's jurisdiction is not defined by the APA. (Although the availability of relief in other courts may limit the district court's jurisdiction under the APA, see 5 U.S.C. § 704, the converse is not true: the availability of relief here is not undermined by, say, the possibility of declaratory relief in district court.) The Court's APA analysis, in other words, tells us nothing about the limits of this court's jurisdiction.

More importantly, the Bowen decision does not in fact stand for the proposition for which defendant cites it here. In concluding that a Medicaid disallowance claim was properly before the district court, the Supreme Court did not alter the long-standing rule that where a plaintiff seeks payment under a money-mandating statute, this court has jurisdiction over its claim.[11]  Rather, the Court concluded that where the essence of the relief sought was not merely a claim for money owed, but was primarily an effort to define an ongoing relationship between the parties going forward, the district court was the appropriate forum to hear the claim. As the Court explained, "[m]anaging the relationships between States and the Federal Government that occur over time and that involve constantly shifting balance sheets requires a different sort of review and relief process" one to which the APA, with its power to afford prospective relief, was "tailored." Bowen, 487 U.S. at 904 n.39; see also id. at 900 n.31 (describing the Medicaid Act as "a complex scheme . . . that governs a set of intricate, ongoing relationships between the States and the Federal Government"); id. at 905 (refusing "to assume, categorically, that a naked money judgment against the United States will always be an adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties"); id. at 905 n.41 (citing with approval the concurrence in Massachusetts v. Departmental Grant Appeals Bd. of Dep't Health and Human Servs., 815 F.2d 778, 789 (1st Cir. 1987), which described a suit for the reimbursement of court-ordered abortions as falling outside the APA's waiver of sovereign immunity "only because the requested relief 'is unlikely to have any significant prospective effect upon the ongoing grant-in-aid relationship between the Commonwealth and the United States'").

None of the concerns identified by the Bowen majority exist here. NAHASDA, unlike the Medicaid program, does not establish a "complex ongoing

---

[11] The Bowen Court does not rule out—and in fact repeatedly acknowledges—this court's authority to enter money judgments like the one sought in the instant case. See, e.g., Bowen, 487 U.S. at 905 (referring to "a naked money judgment against the United States" as a possible (though arguably inadequate) "substitute for prospective relief"); id. at 910 n.48 (recognizing that "the purely monetary aspects of the case could have been decided in the Claims Court").

relationship between the parties," <u>Bowen,</u> 487 U.S. at 905, involving open accounts and "constantly shifting balance sheets," <u>id.</u> at 905 n.39, requiring the entry of declaratory or injunctive relief "to modify future practices," <u>id.</u> at 905.  <u>Accord</u> <u>Brighton Village Assocs. v. United States</u>, 52 F.3d 1056, 1060 (Fed. Cir. 1995) (distinguishing between a claim that seeks "retroactive monetary relief for HUD's failure to adjust contract rents in the past" and a claim that seeks "an award of prospective relief, namely, the builder's attempt to require HUD to calculate future contract rents in conformity with the statute").  In contrast to the prospective relief sought in <u>Bowen</u>, the instant suit seeks a specific sum allegedly owed plaintiffs under a statutorily conferred money mandate.  Indeed, an adjudication of the lawfulness of HUD's regulatory interpretation will have no future impact on the ongoing relationship between the parties because the Reauthorization Act of 2008 made clear the applicable law going forward.  Contrast with <u>Katz</u>, 16 F.3d at 1209 ("[Plaintiff] unmistakably asks for prospective relief.  An adjudication of the lawfulness of HUD's regulatory interpretation will have future impact on the ongoing relationship between the parties.  The Court of Federal Claims cannot provide this relief.").  Enforcement of a claim for money owed, <u>i.e.</u>, a claim for money damages, is therefore the <u>only</u> relief plaintiffs seek, a remedy the district court in <u>Fort Peck</u> concluded it has no authority to grant.  <u>Fort Peck</u>, 2006 WL 2192043, at *2.  As between prospective relief and a request for money due, in other words, it is clear that plaintiffs seek the latter.  <u>Nat'l Ctr. for Mfg. Sciences v. United States</u>, 114 F.3d 196, 201–02 (Fed. Cir. 1997) (looking to the "true nature of the claims in this case" to determine if  a "simple money judgment issued by the Court of Federal Claims" would be an appropriate remedy" (citing <u>Bowen</u>, 487 U.S. at 893)).  Such relief falls squarely within this court's jurisdiction.

Nor can we accept defendant's  view that a statute that sets up a federal grant program, by definition, cannot be money mandating.  As Justice Scalia recognized in his dissent in <u>Bowen</u>, this court has traditionally exercised jurisdiction over suits for money allegedly due under government grant programs that the government has refused to pay.  <u>Bowen</u>, 487 U.S. at 920 (Scalia, J., dissenting) (citing <u>Missouri</u> <u>Health & Med. Org., Inc. v. United States</u>, 641 F.2d 870, 873 (Ct. Cl. 1981) (grant awarded by Public Health Service); <u>Idaho Migrant Council, Inc. v. United States</u>, 9 Cl. Ct. 85, 88 (1985) ("The United States, for public purposes, has undertaken numerous programs to make grant funds available to various governmental and private organizations. Many hundreds of grants are made each year to states, municipalities, schools and colleges and other public and private organizations . . . . Obligations of the United States assumed in [grant] programs . . . are within this court's Tucker Act jurisdiction")); <u>see also</u> <u>Chula Vista City School Dist. v. Bennett</u>, 824 F.2d 1573 (1987) (identifying the Court of Federal Claims as the proper forum to challenge the government's construction of a federal law providing grant funding to local school districts).  Defendant refers us to a footnote in <u>Bowen</u> for a full-scale departure from this tradition.

17

In footnote 42 of its opinion, the <u>Bowen</u> majority wrote that it was "not altogether clear that the Claims Court would have jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1), to review a disallowance claim," because statutes that have traditionally been interpreted as money mandating "attempt to compensate a particular class of persons for past injuries or labors," and do not, in contrast to the statutory mandate of a federal grant-in-aid program, "direct[] the Secretary to pay money . . . to subsidize future . . . expenditures." <u>Bowen</u>, 487 U.S. at 907 n.42. Elsewhere in the decision, however, the Court makes clear that its characterization of statutorily based Tucker Act claims as involving statutes "that provide compensation for specific instances of past injuries or labors" merely reflects the distinction the decision repeatedly draws between suits seeking a "naked money judgment" and suits seeking the prospective adjustment of an ongoing relationship between the parties. <u>See, e.g.</u>, <u>id.</u> at 901 n.31 (contrasting statutes that "provide compensation for specific instances of past injuries or labors" with a "complex scheme such as the Medicaid Act that governs a set of intricate, ongoing relationships between the States and the Federal Government," and noting that "suits brought under these statutes do not require the type of injunctive and declaratory powers that the district courts can bring to bear in suits under the Medicaid Act"). As discussed above, it is the former with which we are concerned here. Thus, even if we were inclined to interpret a footnote not squarely on point as divesting this court of a portion of its traditional jurisdiction, we do not read this footnote as requiring that result.

Accordingly, we conclude that plaintiffs have properly asserted a claim under a money-mandating statute—NAHASDA—and that we may exercise jurisdiction regardless of the status of that statutory scheme as involving the payment of grant funds. Any claim for money to which a plaintiff is statutorily entitled, in other words, falls within our jurisdiction and is properly the subject of an action for money damages.

B.  <u>The Operation of 25 U.S.C. § 4161</u>

Having established a basis for this court's jurisdiction,[12] we turn next to the

---

[12]  Because we are exercising jurisdiction on the basis of a money-mandating statute, we need not address plaintiffs' alternate contention claiming relief on the ground that the government breached a duty of trust owed them. We note, however, that the government "assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute," <u>United States v. Jicarilla Apache Nation</u>, ___ U.S. ___, 131 S. Ct. 2313, 2325 (2011)—a requirement that plaintiffs have not shown has been satisfied here. "When 'the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, . . .

(continued...)

parties' discussion of 25 U.S.C. § 4161.  In the second claim for relief set forth in their complaint, plaintiffs allege that HUD additionally violated NAHASDA by failing to accord plaintiffs the notice and hearing rights set forth in section 4161 before adjusting their grant allocations.  In plaintiffs' view, this failure represents a material breach of their funding agreements for which they seek compensation.  Defendant, by contrast, reads section 4161 as conferring exclusive jurisdiction on a court of appeals to review an adverse agency action, thereby divesting this court of jurisdiction.[13]  We cannot accept either position.

25 U.S.C. § 4161, titled "Remedies for noncompliance," provides in relevant part as follows:

**(a)  Actions by Secretary affecting grant amounts**

**(1)  In general**

Except as provided in subsection (b) of this section, if the Secretary finds after reasonable notice and opportunity for hearing that a recipient of assistance under this chapter has failed to comply substantially with any provision of this chapter, the Secretary shall—

**(A)** terminate payments under this chapter to the recipient;

---

[12](...continued) neither the Government's "control" over [Indian assets] nor common-law trust principles matter.'"  Id. at 2316 (quoting United States v. Navajo Nation, 556 U.S. 287, ___, 129 S. Ct. 1547, 1558 (2009)).  We are additionally unconvinced that grant funds to which a tribe claims entitlement are properly construed as "Indian assets" for the purposes of trust law or that the Secretary's limited responsibilities in allocating those funds under NAHASDA create the common-law trust duties envisioned by the Supreme Court in United States v. Mitchell, 463 U.S. at 226.

[13]   Puzzlingly, defendant asks that only certain of plaintiffs' claims be dismissed as falling within the exclusive jurisdiction of the circuit court.  ("Accordingly, the Court does not possess jurisdiction to consider plaintiffs' allegations with respect to any alleged violation of the notice and hearing requirements in section 4161.")  If section 4161 is to be construed as conferring exclusive jurisdiction on a circuit court to review an adverse agency action, however, such an interpretation logically would dispose of all of plaintiffs' claims.  That argument is accordingly the one we address—and reject—below.

**(B)** reduce payments under this chapter to the recipient by an amount equal to the amount of such payments that were not expended in accordance with this chapter;

**(C)** limit the availability of payments under this chapter to programs, projects, or activities not affected by such failure to comply; or

**(D)** in the case of noncompliance described in section 4162(b) of this title, provide a replacement tribally designated housing entity for the recipient, under section 4162 of this title.

25 U.S.C. § 4161(d), titled "Review," in turn provides as follows:

**(1) In general**

Any recipient who receives notice under subsection (a) of this section of the termination, reduction, or limitation of payments under this chapter—

**(A)** may, not later than 60 days after receiving such notice, file with the United States Court of Appeals for the circuit in which such State is located, or in the United States Court of Appeals for the District of Columbia, a petition for review of the action of the Secretary . . . .

Finally, 25 U.S.C. § 4161(d)(4) provides that "[u]pon the filing of the record with the court, the jurisdiction of the court shall be exclusive and its judgment shall be final except that such judgment shall be subject to review by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of Title 28."

The court cannot endorse plaintiffs' argument. The record before the court includes extensive correspondence between HUD and several of the plaintiff tribes regarding the government's claims of overpayment of grant funds. In particular, this correspondence identifies the regulations on which the government bases its claims, provides guidelines explaining these regulations, lists by project number the specific housing units that the government regards as ineligible for grant purposes, and invites plaintiffs to review the government's data and supply any information regarding the disputed housing units that would establish their continuing eligibility to be counted as part of a tribe's qualifying housing stock. In light of this correspondence, it is difficult to understand how plaintiffs reasonably can assert that HUD failed to accord

them the procedural protections provided under section 4161 when in fact they were given full notice of the government's claims along with a meaningful opportunity to respond. If HUD was required to do more to satisfy section 4161, then it was up to plaintiffs to make that case here. They have not done so. Plaintiffs have failed to show any prejudice as a result of the procedures that HUD followed and thus have failed to state a claim upon which relief can be granted.[14]

Similarly devoid of merit is defendant's contention that 25 U.S.C. § 4161(d)(4) divests this court of jurisdiction over plaintiffs' claims. In defendant's view, a statute that provides for review of a claim in another court withdraws jurisdiction from this court even in the absence of specific language that such jurisdiction is exclusive. In support of this proposition, defendant relies primarily on Biltmore Forest Broadcasting FM, Inc. v. United States, 555 F.3d 1375, 1382–84 (Fed. Cir. 2009), and City of Boston v. United States Dep't of Housing and Urban Dev., 898 F.2d 828, 834–35 (1st Cir. 1990). As the court observed in Acceptance Ins. Cos. v. United States, 503 F.3d 1328, 1336 (Fed. Cir. 2007), however, the "withdrawal of Tucker Act jurisdiction by implication is disfavored, which means that a court must find that the statute at issue . . . reflects an unambiguous congressional intent to displace the Tucker Act's waiver of sovereign immunity." This standard has not been met here.

Defendant has offered no evidence that Congress intended the review procedure set forth in section 4161 to displace this court's traditional jurisdiction to afford relief for the violation of a money-mandating statute. See, e.g., California v. United States, 271 F.3d 1377, 1383 (Fed. Cir. 2001) (finding no evidence in the text or legislative history of the Flood Control Act of 1928 that Congress had "withdrawn the Tucker Act grant of jurisdiction," where "the Tucker Act . . . is not mentioned in the statute and does not appear in the legislative history to have been discussed at all," relying on Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1017 (1984)). Section 4161(d)(4) in fact indicates that jurisdiction in a circuit court is exclusive

---

[14] Even if the court were to conclude that the procedures HUD followed were somehow inadequate, plaintiffs would not be permitted, at this late stage of the litigation, to seek damages for the denial of procedural rights they did not themselves assert in a timely manner. Plaintiffs' failure to insist on any such procedural rights at the relevant time—i.e., while the proposed recapture of their grants funds was under consideration by HUD and while the injury of which they now complain therefore could have been avoided—constitutes a waiver of those rights. Restatement (Second) of Contracts § 350 cmt. b (1981). Such is the case even if, as plaintiffs now contend, the agency failed to inform them of those rights; plaintiffs must be charged with knowledge both of the relevant statutory scheme and of their rights under the funding agreements, particularly where plaintiffs maintain that such procedural rights were a material part of those agreements.

only "[u]pon the filing of the record with the court," a record presumably generated through the notice and hearing procedures referenced in section 4161(a). It would be an anomalous result indeed to conclude that section 4161 deprives this court of jurisdiction even where its terms—the filing of a record with a circuit court—have not been met.

Neither of the cases defendant cites causes us to reach a different conclusion. In Biltmore, 555 F.3d 1375, for instance, the Federal Circuit faced the question of whether the Court of Federal Claims had jurisdiction to review the Federal Communications Commission's denial of a construction permit. The court held that a statute that provided that "[a]ppeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia" conferred exclusive jurisdiction on the District of Columbia Circuit for judicial review of the Commission's licensing decisions and consequently that the Court of Federal Claims lacked subject-matter jurisdiction over the claim. Id. at 1381–82. The Federal Circuit based its conclusion on the court's prior ruling in Folden v. United States, 379 F.3d 1344, 1356–57 (Fed. Cir. 2004). Biltmore, 555 F.3d at 1382 ("Recently, in Folden, we . . . held that it has been long-settled that [47 U.S.C.] § 402(b) provides that the District of Columbia Circuit is the exclusive location for judicial review of the FCC's licensing decisions. Therefore, the Court of Federal Claims lacks subject-matter jurisdiction to review the FCC's denial of a construction permit." (Citation omitted.)).

In Folden, 379 F.3d at 1357, the Federal Circuit found that the Communications Act represented "a comprehensive statutory and regulatory regime governing orders of the Commission," including the vesting of jurisdiction on the district courts over the enforcement of Commission orders, the vesting of jurisdiction on courts of appeal and the District of Columbia Circuit over the judicial review of such orders, the requirement that a party first appeal within the Commission before pursuing judicial remedies, the imposition of various filing deadlines for appeals from Commission orders, the provision to interested parties of notice of an appeal, the requirement of specific information to be contained within an appeal, and the procedure by which an interested party may intervene in appeal proceedings. The court went on to explain that "[w]hen such a 'specific and comprehensive scheme for administrative and judicial review' is provided by Congress, the Court of Federal Claims' Tucker Act jurisdiction over the subject matter covered by the scheme is preempted." Id. (citations omitted).

In contrast to the statutory scheme set up in Folden, however, section 4161 does not present a "specific and comprehensive scheme for administrative and judicial review" of all claims involving NAHASDA. Instead, section 4161 merely authorizes the circuit court to hear challenges to determinations made under section 4161(a), following the requisite notice and hearing procedures set forth in that

section.  Only upon the filing of the record with the circuit court does jurisdiction become exclusive, and then only with respect to the claim at issue (i.e., a challenge to the section 4161(a) determination).  Biltmore and Folden are thus distinguishable on their facts from the instant case.

Similarly, in City of Boston, 898 F.2d at 828, the Court of Appeals for the First Circuit interpreted a provision virtually identical to section 4161 as vesting jurisdiction in the circuit court over a claim challenging HUD's termination of the city's grant without a hearing.  Significant for our purposes, however, the court explicitly declined to reach the issue of whether such jurisdiction was exclusive.  Id. at 835 n.7 ("We need not decide whether the district courts have concurrent jurisdiction under the Administrative Procedure Act over actions to compel HUD to provide a hearing unlawfully withheld under [42 U.S.C. § 5311(a)].")

Accordingly, we conclude that section 4161 does not divest this court of jurisdiction to hear plaintiffs' money-mandating claim and that for reasons earlier noted, it equally does not provide plaintiffs with a separate ground for relief in this court.  We therefore dismiss plaintiffs' second claim for relief as it relates to alleged violations of 25 U.S.C. § 4161.[15]

C.  Authority to Review 24 C.F.R. § 1000.318

For the first time during oral argument, defendant raised the contention that this court lacks authority to declare a regulation invalid or to consider claims that are contingent on such a declaration.  According to defendant, this court cannot reach the issue of whether damages are owed to plaintiffs until it first accepts plaintiffs' argument that the disputed regulation, 24 C.F.R. § 1000.318, conflicts with section 4152(b)(1) of NAHASDA and is therefore invalid. Defendant thus sees plaintiffs' request for monetary relief as incidental or collateral to their request for declaratory relief—a remedy defendant asserts is unavailable in this court.

---

[15]  As with 25 U.S.C. § 4161, plaintiffs similarly argue that HUD failed to accord them the procedural protections contemplated under 25 U.S.C. § 4165—a companion statute that allows the Secretary to audit or review a grant recipient's compliance with regulatory requirements and to adjust the amount of a grant on the basis of findings made pursuant to such an audit or review.  More particularly to plaintiffs' point, the statute provides that the grant recipient shall be provided the opportunity to review and comment on any audit or report and it renders the Secretary's authority to adjust the amount of a grant subject to the "reasonable notice and opportunity for hearing" requirements of section 4161(a).  Plaintiffs do not explain how the requirements of this section add to the dimensions of their claim, however, and consequently, we do not address it further.

Having considered supplemental briefing on this issue, the court concludes that defendant's position has no merit. Defendant confuses a type of relief sought—a declaratory judgment—with a ruling on the scope of plaintiffs' rights. <u>Pauley Petroleum Inc. v. United States</u>, 591 F.2d 1308, 1315–16 (Ct. Cl. 1979) (describing as an "erroneous syllogism" the argument that because the Court of Claims has no jurisdiction to issue declaratory judgments and because plaintiffs ask for a declaration of their rights in order to reach a judgment, a declaration of rights is a declaratory judgment and therefore beyond this court's jurisdiction). As this court recognized in <u>Pauley</u>, however, "merely because the court must make a ruling of law . . . in order to arrive at a money judgment does not render this court's decision a 'declaratory judgment' banned under <u>King</u>." <u>Id.</u> at 1315 (citing <u>Gentry v. United States</u>, 546 F.2d 343, 345–46 (Ct. Cl. 1976)).

Indeed, in <u>Gentry</u>, this court concluded that the plaintiff had asserted a claim for money presently due, thereby coming within this court's jurisdiction, despite the fact that the entitlement depended on the court's first finding that a provision of a statute was unconstitutional. <u>Gentry</u>, 546 F.2d at 345–46. Rejecting an argument identical to the one defendant now asserts, the <u>Gentry</u> court explained its position as follows:

> Plaintiff has come before this court, not asking for a declaration of his rights as in <u>King</u>, but seeking money allegedly due him. The money claim is grounded, according to plaintiff, on the statute as it now exists—at least when read in light of the Fifth Amendment—and thus states a claim for money presently due, not requiring further action on anyone's part to create the entitlement thereto. This is exactly the kind of claim within our jurisdiction under <u>Testan</u>. The issue of the constitutional validity of the [statutory] requirement arises only incidentally, necessitating an answer by the court in the course of construing the annuity statute to determine whether payments is indeed owing to plaintiff. It is in this fashion that constitutional claims had arisen and been decided in the courts of the United States in the 140 years of their existence before the passage of the Declaratory Judgment Act in 1934, 28 U.S.C. § 2201 (1970).

<u>Id.</u> at 346.

Similarly, in <u>Fisher</u>, 402 F.3d at 1175, the Federal Circuit concluded that a plaintiff could pursue a claim in this court for retirement pay under a statute found by the court to be money mandating, despite the fact that the claim was contingent on the court's first overturning the agency's determination that the plaintiff had not satisfied the statute's requirements. The court explained its reasoning as follows:

> In the case before us, [plaintiff] contends that the [agency's] determination that he was fit for duty [and thus not eligible for retirement benefits under the statute] was arbitrary and capricious and contrary to law. He wants the money that would have been his due had he been discharged in the manner to which he claims he was entitled, and he wants the necessary steps taken to position himself for that result—i.e., reinstatement, etc. That is a classic Tucker Act suit for money and the related remedies the trial court is authorized to grant.

Id.  In allowing the claim to go forward, the Fisher court rejected the contention, raised here, that a review of the agency's determination constituted a declaratory judgment over which the trial court lacked jurisdiction. "If [plaintiff] were to succeed on his claim that the Secretary's decision was wrong and should be reversed, he would be entitled to disability retirement pay under [the statute], and whatever procedural remedies were necessary to achieve that result. The Court of Federal Claims is fully empowered to grant such remedies."  Id.

Nor are the cases on which defendant relies to the contrary.  In Todd v. United States, 386 F.3d 1091 (Fed. Cir. 2004), employees of the Federal Aviation Administration brought suit in this court for back pay, alleging that an increase in the air traffic at their facility should have resulted in an upgrade of the facility's classification and a corresponding increase in their salaries and benefits.  The trial court dismissed their action for failure to state a claim upon which relief can be granted and the Federal Circuit affirmed on appeal.  In its decision, the Federal Circuit recognized that the Court of Federal Claim's  jurisdiction is "'limited to actual, presently due money damages from the United States.'" Id. at 1093–94 (quoting Testan, 424 U.S. at 398 (quoting King, 395 U.S. at 3)).  The court went on to note that the employees could not establish jurisdiction under the Tucker Act for a claim for money damages against the United States because they were not "seeking presently due money damages, but instead seek the equitable remedy of a reclassification of the [facility at which they worked] and a salary increase based on that reclassification."  Todd, 386 F.3d at 1094.  "Absent a prior reclassification," in other words, "appellants have no claim for back pay."  Id.

The court rested its conclusion on Testan, 424 U.S. at 398, a case, according to the Todd court, in which the Supreme Court "expressly addressed the jurisdiction of the Court of Federal Claims to provide this type of equitable relief."  Todd, 386 F.3d at 1094.  Discussing that precedent, the Todd court wrote as follows:

> The Testan court held that "federal agencies continue to have discretion in determining most matters relating to the terms and conditions of federal employment," and Government employees may

> not receive pay for positions to which they have not been appointed. [Testan, 424 U.S. at 406]. Without first obtaining a retroactive promotion, the Court found, the plaintiffs in Testan lacked an entitlement to money damages against the United States; the case was dismissed for lack of jurisdiction.

Id. at 1094–95. As the Todd court noted, however, "Testan confirms the long-standing rule that 'one is not entitled to the benefit of a position until he has been duly appointed to it.'" Id. at 1095 (quoting Testan, 424 U.S. at 402). That is not our situation. Here, plaintiffs do not challenge the discretion of an employing agency by seeking the benefit of a position they have not yet obtained; rather, plaintiffs seek funding to which they claim a present entitlement if the statute is correctly applied. Such a claim falls squarely within this court's jurisdiction.

Defendant's reliance on Yeskoo v. United States, 34 Fed. Cl. 720 (1996), is similarly misplaced. In Yeskoo, an Internal Revenue Service employee brought suit in this court seeking the reimbursement of relocation expenses incurred as the result of his transfer to a new assignment. Id. at 724. Although the court concluded that the statutes and their implementing regulations were part of a money-mandating scheme, id. at 730, the court nevertheless dismissed the second count of the complaint under the theory that it sought a declaratory judgment—a species of relief that the court explained it was not empowered to grant, id. at 731. Specifically, in the second count of the complaint, plaintiff alleged that the applicable regulations were "discriminatory, arbitrary, and capricious" and should be declared invalid to the extent they precluded plaintiff's recovery. Id. Regarding this demand, the court declared that it "does not possess jurisdiction to issue the type of declaratory relief requested by the plaintiff to strike down the regulations at issue in the instant case." Id. Defendant now cites this language for the proposition that this court is without authority to declare a regulation invalid.

Contrary to defendant's interpretation, however, we do not read the quoted language as standing for the proposition that this court is always without authority to declare a regulation invalid. That is not the law. Where the relief sought is the enforcement of a claimed right to money pursuant to a money-mandating statute and the challenge is to a regulation interpreting that statute, our jurisdiction may be invoked. Indeed, this very point is recognized in Yeskoo, where the court, in addressing the remainder of plaintiff's complaint, went on to find that "[a]fter an examination of the statutes and regulations at issue in this case . . . the [challenged regulations] are not inconsistent . . . with the statute." Id. at 735. Put simply, then, Yeskoo does not argue against the exercise of our jurisdiction here.

Defendant's reliance on Cienega Gardens v. United States, 33 Fed. Cl. 196, 224 (1995), judgment vacated on other grounds, 194 F.3d 1231 (Fed. Cir. 1998), is

equally unavailing.  In <u>Cienega</u>, the owners of low- and moderate-income housing who had received mortgage insurance from HUD brought suit alleging that the imposition of statutory restrictions affecting their right to pre-pay their mortgages (and thus end affordability restrictions on their properties) constituted a breach of contract, a Fifth Amendment taking, and various unlawful administrative actions for which compensation was due.  Although the trial court allowed the contract and takings claims to proceed, it dismissed the unlawful administrative action claims.  <u>Id.</u>  With respect to plaintiffs' contention that HUD's regulations would cause plaintiffs damage by denying them a fair market appraisal of their properties, the court concluded that it did not have jurisdiction because "[t]his court has no authority to order HUD to adopt or change any particular regulation, nor may it declare any particular regulation invalid."  <u>Id.</u>

Defendant relies on these last-quoted words but once again draws too broad a rule from them.  The regulations that the <u>Cienega</u> court addressed were the agency's real property appraisal guidelines, and the concern raised by plaintiffs was that the application of those guidelines could be expected to result in an underevaluation of their properties.  Plaintiffs' challenge, in other words, was simply an attack against the appraisal guidelines in general rather than against their application to any specific property; hence, no immediate monetary consequence would ensue from the guidelines' invalidation.  Simply put, plaintiffs were asserting an equitable demand only—a naked request for declaratory relief—as opposed to a challenge that, if successful, would result in a money judgment in their favor.  In short, the challenge to the regulations (the appraisal guidelines) raised in <u>Cienega</u> concerned a claim <u>about</u> money; not a claim <u>for</u> money.  It is in the latter context that this court's jurisdiction to set aside a regulation is properly exercisable.

Plaintiffs in the instant case first and foremost seek money damages based on an alleged violation of NAHASDA, as well as the unlawful enforcement of the regulations implemented under NAHASDA (including 24 C.F.R. § 1000.318).  Whether 24 C.F.R. § 1000.318 is valid is a question of law that is, at most, "tied and subordinate to a monetary award" sought under the statute.  <u>Gentry</u>, 546 F.2d at 355 (quoting <u>Austin v. United States</u>, 206 Ct. Cl. 719, 723 (1975)).  Resolution of this issue falls within our jurisdiction.[16]

---

[16]   We will not, as defendant requests, order additional briefing at this juncture to test whether 24 C.F.R. § 1000.318 in fact conflicts with section 4152(b)(1) and is therefore invalid.  This issue goes to the very heart of plaintiffs' case-in-chief and will accordingly be resolved in the traditional course of litigation rather than as a threshold jurisdictional issue.  <u>Thoen v. United States</u>, 765 F.2d 1110, 1114 (Fed. Cir. 1985) (explaining that "a motion to dismiss for lack of jurisdiction may properly be converted into a motion for summary judgment [and

(continued...)

D.  The Anti-Deficiency Act

Despite our conclusion that we have jurisdiction over plaintiffs' statutory claims, defendant argues in the alternative that the claims are nevertheless moot because the funds appropriated for the fiscal years in question have been distributed to other grant recipients.[17] This result, in defendant's view, is required by the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A), which provides, in relevant part, that "[a]n officer or employee of the United States Government . . . may not . . . make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation[.]"  Defendant additionally cites Samish, 90 Fed. Cl. 122, for the proposition that the Anti-Deficiency Act bars this court from providing a monetary remedy where the funds appropriated for the program have been depleted.

In Samish, the court concluded that even if the court had "jurisdiction to provide a monetary remedy when grant funds are not properly disbursed by the federal government, its ability to do so is limited by operation of the Antideficiency Act."  Id. at 133 n.10.  The Samish court went on to note that funds appropriated for an agency's use could become unavailable in three circumstances: (1) where the appropriation lapses; (2) where the funds have already been disbursed to other recipients; or (3) where Congress rescinds the appropriation.  Id. (relying on City of Houston v. United States Dep't of Housing and Urban Dev., 24 F.3d 1421, 1426 (D.C. Cir. 1994), and citing in accord Star-Glo Assocs. v. United States, 414 F.3d 1349, 1354 (Fed. Cir. 2005) (noting that if a statute imposes a cap on expenditures for a particular purpose, "payments in excess of the cap would violate the Anti-deficiency Act")).  Where any of these circumstances have occurred, the Samish court concluded that the Anti-Deficiency Act would moot a plaintiff's claim.  Id.

---

[16] (...continued)
matters outside the pleadings considered] only when the jurisdictional question is inextricably intertwined with the merits of the case").

[17] According to defendant, HUD allocates all NAHASDA funding in the year it is appropriated by Congress.  Amounts that are allocated to a tribe but not distributed are carried over and obligated in the following fiscal year.  See Declaration of Deborah M. Lalancette, Director of the Office of Grants Management, Office of Native American Programs, Department of Housing and Urban Development, ¶ 14 (Dec. 15, 2010).  Defendant thus explains that appropriations for fiscal years 1998 through 2005 are no longer available.  Defendant notes, however, that HUD, at the direction of the district court, has set aside funds from fiscal years 2006, 2007, and 2008 to pay possible judgments in the district court cases.

At issue in <u>City of Houston</u> was whether a district court, exercising jurisdiction under the APA, could provide specific performance (the remedy available to the court under the APA) where the very thing sought—plaintiff's proper share of appropriated grant funds—was no longer available.  In denying relief, the court explained that "[a]n award of monetary relief from any source of funds other than the 1986 . . . appropriation would constitute money damages rather than specific relief, and so would not be authorized by APA section 702."  <u>City of Houston</u>, 24 F.3d at 1428.  The same issue was also addressed in <u>County of Suffolk v. Sebelius</u>, 605 F.3d 135 (2nd Cir. 2010), another case on which defendant relies.  There too the plaintiffs sought to invoke section 702 of the APA to enforce a claimed entitlement to grant funds but were unsuccessful in their efforts because of the exhaustion of appropriated funds.  <u>Id.</u> at 140–41.  Section 702, the court explained, "only functions as an effective waiver of the government's sovereign immunity to the extent that plaintiffs seek to force HHS to return property to Nassau-Suffolk, where the *res* at issue is the funds appropriated by Congress for this grant program for FYs 2007 and 2008."  <u>Id.</u>  "To seek funds from another source," the court further explained, "is to seek compensation rather than the specific property the plaintiff aims to recover."  <u>Id.</u> at 141.  And the former type of relief, the court concluded, "falls outside the scope of the waiver of sovereign immunity arising from § 702 of the APA" <u>Id.</u>  It was in this situation then—where specific relief was being sought under section 702 of the APA—that the courts in <u>City of Houston</u> and <u>County of Suffolk</u> concluded that where the funds already had been disbursed to other recipients or had lapsed, the district court had no power to award the specific property sought and the plaintiffs' claims were therefore moot.

But that is not the situation here.  This court is not being asked to award specific relief under the APA, but rather is being asked to award money damages for HUD's alleged failure to comply with a money-mandating statute.  The judgment fund—a permanent revolving appropriation by Congress—is specifically designed for the payment of such damages. 31 U.S.C. § 1304;[18] 28 U.S.C. § 2517 ("every final

---

[18]   31 U.S.C.  §  1304, titled "Judgments, awards, and compromise settlements," provides in relevant part as follows:

> (a)  Necessary amounts are appropriated to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law when—
>
> (1)  payment is not otherwise provided for;
>
> (2)  payment is certified by the Secretary of the Treasury; and
>
> (continued...)

judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefor").  As the Federal Circuit observed in Bath Iron Works Corp. v. United States, 20 F.3d 1567, 1583 (Fed. Cir. 1994), 31 U.S.C. § 1304 "was intended to establish a central, government-wide judgment fund from which judicial tribunals administering or ordering judgments, awards, or settlements may order payments without being constrained by concerns of whether adequate funds existed at the agency level to satisfy the judgment." Accord Lopez v. A.C. & S., Inc., 858 F.2d 712, 716 (Fed. Cir. 1988) ("There is a standing appropriation to pay court judgments and appeal board awards, 31 U.S.C. § 1304, so courts and boards, in rendering judgment, are not required to investigate whether program funds are available.").  The Anti-Deficiency Act, in other words, simply does not apply in this situation.[19]

Nor, as defendant contends, is this case similar to those in which courts have held that a plaintiff cannot recover an underpaid grant or subsidy because the relevant appropriation has been exhausted.  See, e.g., Highland Falls-Fort Montgomery Cent. School Dist. v. United States, 48 F.3d 1166 (Fed. Cir. 1995).  At issue in Highland Falls was whether a plaintiff could recover the amount it was owed under a statute

---

[18](...continued)
        (3)  the judgment, award, or settlement is payable—

        (A) under section 2414, 2517, 2672, or 2677 of title 28 . . . .

28 U.S.C. § 2517, titled "Payment of judgments," in turn provides as follows:

        (a) Except as provided by chapter 71 of title 41 [the Contract Disputes Act], every final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefor, on presentation to the Secretary of the Treasury of a certification of the judgment by the clerk and chief judge of the court.

[19]  As noted above, the Samish court also cited Star-Glo, 414 F.3d at 1354, for the proposition that where an appropriation statute imposes a cap, payments in excess of the cap would violate the Anti-Deficiency Act.  Defendant, however, does not argue that the instant case involves a statutory cap.  Rather, its position is simply that exhaustion of the funding that Congress provided for NAHASDA, taken in conjunction with the limitations imposed by the Anti-Deficiency Act, disables the court from granting plaintiffs any relief.  Thus, the rule stated in Star-Glo has no relevance here.

when Congress had deliberately chosen, through earmarks, to appropriate less money for entitlements under the act than was required to fund those entitlements fully.  The Highland Falls plaintiffs argued that the agency had erred in following Congress's specific funding directives instead of applying the allocation formula set forth in the statute for underfunding.

The court ruled for the agency.  Describing the "precise question at issue" in the case as "whether, in the face of underfunding by Congress, [the Department of Energy] erred in allocating funds . . . based upon the amounts earmarked for that section in the respective appropriations laws, instead of funding . . . entitlements . . . in accordance with [the statute]," the court concluded that "Congress 'has directly spoken' to this question and that DOE, in following the approach it did, 'g[a]ve effect to the unambiguously expressed intent of Congress.'" Id. at 1170 (quoting Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984)).  The court thus held that the agency acted properly in implementing the will of Congress as indicated in the annual appropriation bills.

Highland Falls, of course, is not our case.  We do not face an underfunding situation, nor any clear will of Congress expressed through an appropriations bill.  Rather, this is a situation in which the agency is alleged to have misallocated funds.  The damages suffered by the tribes, if proven, are compensable.

Finally, even if we were to apply the rule set out in Samish, plaintiffs would nevertheless prevail on this issue.  The concern addressed in Samish is when grant appropriations have lapsed (and have thereby returned to the Treasury) or have been disbursed to other recipients.  In the instant case, however, unused appropriations do not revert to the Treasury but rather remain in the program.  And defendant acknowledges that HUD, at the direction of the district court, has set aside program funds for fiscal years 2006 onward to satisfy potential judgments.  We see no reason why those sums would not be available for the payment of a judgment here.

E. Statute of Limitations

Having determined that NAHASDA provides a money mandate that survives defendant's various arguments to the contrary, we turn now to defendant's final challenge to this court's jurisdiction:  the statute of limitations.  In defendant's view, claims that relate to fiscal years 1998 through 2002 accrued prior to November 2002 (six years before plaintiffs filed suit in this court on November 26, 2008) and must therefore be dismissed as out of time.  We agree.

This court's statute of limitation, set forth at 28 U.S.C. § 2501, specifies that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim

first accrues."  A cause of action accrues under this section when "all events have occurred to fix the Government's alleged liability," and the plaintiff "knew or should have known that the claim existed."  <u>Martinez v. United States</u>, 333 F.3d 1295, 1303, 1319 (Fed. Cir. 2003).  "It is a plaintiff's knowledge of the facts of the claim that determines the accrual date." <u>Young v. United States</u>, 529 F.3d 1380, 1385 (Fed. Cir. 2008).

In the instant case, plaintiffs were notified of HUD's intention to recapture the allegedly overpaid grant funds as early as 2001, putting plaintiffs on notice by that date as to the existence of their claims.  And their cause of action accrued at the very latest when plaintiffs were in fact required to repay those grant funds—an event that occurred by 2002.  Accordingly, plaintiffs' claims relating to fiscal years 1998 through 2002—filed on November 26, 2008 (more than six years after the recapture of those funds)— are out of time.[20]

Plaintiffs argue, however, that the statute of limitations question is addressed—and answered in their favor—within the text of NAHASDA itself.  In particular, plaintiffs observe that Congress specified in the Reauthorization Act of 2008 that the 2008 amendments did "not apply to any claim arising from a formula current assisted stock calculation or count involving an Indian housing block grant allocation for any fiscal year through fiscal year 2008, if a civil action relating to the claim is filed by not later than 45 days after October 14, 2008." 25 U.S.C.§ 4152(b)(1)(E).  Plaintiffs interpret this provision as authorizing any action that satisfies the 45-day limitation period identified, a test they contend has been met here.

Contrary to plaintiffs' assertion, however, we do not read 25 U.S.C. § 4152 as providing an exception to our statute of limitations period.  Rather, that statute allows for the essentially retroactive application of the former regulations provided that a litigant files suit within 45 days of October 14, 2008.  That provision says nothing about the viability of claims otherwise time-barred under 28 U.S.C. § 2501. As waivers of sovereign immunity are to be strictly construed, <u>see</u> <u>United States Dep't of Energy v. Ohio</u>, 503 U.S. 607, 615 (1992) (observing that the scope of a waiver of sovereign immunity "must be construed strictly in favor of the sovereign and not enlarged beyond what the language requires"), we cannot endorse plaintiffs'

---

[20] Although plaintiffs' cause of action with respect to fiscal years 1998 through 2002 accrued when HUD began its recapture of those funds in 2002, their cause of action with respect to any subsequent fiscal year did not accrue until plaintiffs received grant funds in that year in an amount less than that to which they allegedly were entitled.  Plaintiffs may therefore pursue claims for fiscal years 2003 through 2008 as those claims did not accrue until plaintiffs suffered damage in those fiscal years.

expansive reading of the 2008 NAHASDA amendments.

CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is granted in part and denied in part as follows:

(1) the claims of plaintiff Fort Peck Housing Authority are dismissed for lack of jurisdiction on the basis of 28 U.S.C. § 1500; and

(2) regarding the claims of the remaining plaintiffs,

(i) the first claim for relief alleging unlawful recapture of grant funds affecting fiscal years 1998 through 2002 is dismissed for lack of jurisdiction on the basis of 28 U.S.C. § 2501 (the remainder of the first claim for relief, involving fiscal years 2003 through 2008, represents a claim over which this court has jurisdiction);

(ii) the second claim for relief (alleging violations of 25 U.S.C. §§ 4161 and 4165) is dismissed for failure to state a claim upon which relief can be granted; and

(iii) the third claim for relief (alleging breach of trust) is dismissed without prejudice.

In concluding that we possess jurisdiction over this matter, we offer no opinion as to the ultimate merit of plaintiffs' claims. Whether plaintiffs are correct that 24 C.F.R. § 1000.318 violates NAHASDA is a question of law, one that will presumably be resolved on cross-motions for summary judgment.

s/John P. Wiese
John P. Wiese
Judge

33