# In the United States Court of Federal Claims

No. 08-848C
Filed: August 21, 2012

|  |  |
|---|---|
| )<br>LUMMI TRIBE OF THE LUMMI )<br>RESERVATION, LUMMI )<br>NATION HOUSING AUTHORITY, )<br>FORT PECK HOUSING )<br>AUTHORITY, FORT BERTHOLD )<br>HOUSING AUTHORITY, AND )<br>HOPI TRIBAL HOUSING )<br>AUTHORITY, )<br> )<br>            Plaintiffs, )<br> )<br> )<br>        v. )<br> )<br> )<br>THE UNITED STATES, )<br> )<br>            Defendant. )<br> )<br> ) | <u>Section 405 of the Native American</u><br><u>Housing Assistance and Self-</u><br><u>Determination Act of 1996</u><br><u>("NAHASDA"), 25 U.S.C. § 4165.</u><br>When a statutory provision and its<br>implementing regulations specify<br>procedures to be followed with<br>respect to the recapture of grant<br>funds, an agency is not free to<br>disregard those procedures and resort<br>instead to federal common law<br>remedies. |

<u>John Fredericks, III</u>, Fredericks Peebles & Morgan LLP, Mandan, ND, counsel for plaintiffs.

<u>Michael N. O'Connell</u>, with whom were <u>Acting Assistant Attorney General Stuart F. Delery</u>, <u>Director Jeanne E. Davidson</u>, and <u>Assistant Director Donald E. Kinner</u>, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, counsel for defendant.

## SUPPLEMENTARY OPINION

<u>WIESE</u>, Senior Judge.

This case arises under the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA" or "the statute"), as amended, 25 U.S.C. §§ 4101–4212 (2006). Plaintiffs sue here to recover grant funds originally paid to them under that statute, but later recaptured by the Department of Housing and Urban Development ("HUD" or "the agency") when HUD determined that the

allocation formula on which the grants had been based had been misapplied. Defendant has moved to dismiss count two of plaintiffs' second amended complaint—a count alleging that HUD's recapture of grant funds without conducting a compliance hearing constituted an illegal exaction—on the ground that the recapture was lawfully accomplished despite the absence of such a hearing.[1]  The court heard oral argument on June 19, 2012.  Because we conclude that HUD failed to follow the applicable procedures in recapturing plaintiffs' grant funds, defendant's motion to dismiss is denied.

---

[1] In an earlier round of litigation in this case, defendant moved to dismiss plaintiffs' entire complaint, arguing, inter alia, that: (i) NAHASDA is not a money-mandating statute and therefore does not confer jurisdiction on this court; (ii) the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A), precludes this court from awarding the relief sought; and (iii) plaintiffs' claims are barred by the statute of limitations, 28 U.S.C. § 2501.  In an opinion issued on August 4, 2011, we rejected defendant's first two arguments, ruling that NAHASDA is indeed a money-mandating statute whose implementing regulations may be challenged by plaintiffs in this court, and that the Anti-Deficiency Act does not prevent the court from awarding the requested relief (a conclusion that was later confirmed by the Federal Circuit in Samish Indian Nation v. United States, 657 F.3d 1330, 1339 (Fed. Cir. 2011)).  Lummi Tribe of the Lummi Reservation v. United States, 99 Fed. Cl. 584, 597, 605 (2011).  We accepted defendant's third argument, however, and accordingly dismissed plaintiffs' claims for grant funds relating to fiscal years 1998 through 2002 as having accrued more than six years before plaintiffs' November 26, 2008, filing of suit in this court and thus as barred by the statute of limitations.  Id. at 607.  We additionally dismissed that aspect of plaintiffs' complaint—count two—challenging HUD's recapture of grant funds without conducting a compliance hearing, on the ground that any failure to do so was not prejudicial.  Id. at 599.

Plaintiffs moved for reconsideration of the court's decision.  Following a hearing on the matter, the court issued an order on September 29, 2011, vacating that portion of our August 4, 2011, decision dismissing plaintiffs' second claim for relief (the claim challenging HUD's recapture of grant funds in the absence of a compli-ance hearing).  Pursuant to the court's order, plaintiffs filed a second amended complaint on October 28, 2011, containing a revised second claim for relief in which they again challenge HUD's recapture of grant funds without conducting a compliance hearing.  That revised second claim for relief is the subject of defendant's current motion to dismiss.

FACTS[2]

The statute at issue in this case, NAHASDA, directs the Secretary of HUD to provide annual grants to Indian tribes or tribal housing authorities in support of their need for affordable housing.  The distribution of these funds is accomplished through a formula, set forth at 24 C.F.R. §§ 1000.301–1000.340, that determines the amount each grant recipient is to receive based in part on the recipient's Formula Current Assisted Stock ("FCAS")—the inventory of rental units and lease-to-own units owned by the recipient as of September 30, 1997, the effective date of NAHASDA.

Plaintiffs have received NAHASDA grants annually since 1998.  In 2001, however, HUD's Office of Inspector General ("OIG") performed a nationwide audit of the NAHASDA program.  The resulting report concluded that HUD had improperly administered the grant program by failing to exclude from the grant calculation housing units that no longer qualified as FCAS under the relevant regulations.  In particular, the report criticized HUD for failing to enforce 24 C.F.R. § 1000.318, a regulation specifying that housing units are to be excluded from FCAS "when the Indian tribe . . . no longer has the legal right to own, operate, or maintain the unit" so long as such units are conveyed "as soon as practicable after a unit becomes eligible for conveyance."  The OIG recommended that HUD audit all housing units included in the allocation formula, remove ineligible units, recover funding from grant recipients that had received overpayments based on ineligible FCAS, and reallocate the recovery to other NAHASDA grant recipients that had been underfunded.

HUD accordingly notified a number of Indian tribes and tribal housing authorities (including all of the plaintiffs in this action) that the agency intended to recover overpaid grant funds from them.  Toward this end, HUD provided plaintiffs with the applicable regulations, the guidelines explaining those regulations, and a list of the specific housing units that HUD regarded as ineligible for grant purposes. HUD additionally invited plaintiffs to review HUD's data and to supply any information that would establish the continuing eligibility of the challenged units as qualifying housing stock.  HUD did not, however, conduct formal hearings on this issue.

---

[2] We limit our discussion to those facts relevant to plaintiffs' revised second claim for relief; a more comprehensive recitation of the facts can be found in our earlier decision.  Lummi Tribe of the Lummi Reservation v. United States, 99 Fed. Cl. 584, 587–90 (2011).

HUD ultimately determined that since November 26, 2002,[3] the Lummi Tribe had received $863,236 in overpayments, the Fort Berthold Housing Authority had received $249,689 in overpayments, and the Hopi Tribal Housing Authority had received $964,699 in overpayments as a result of the inclusion of ineligible FCAS in the allocation formula.[4]   Of these amounts, HUD has recaptured the entire overpayment from the Hopi Tribal Housing Authority and all but $14,029 from the Lummi Tribe and $125,399 from the Fort Berthold Housing Authority, through the offset of overpayments against underpayments and through the reduction of subsequent years' grants.   Recovery of the outstanding overpayments has been identified as on hold pending the outcome of this litigation.

DISCUSSION

I.

In count two of their second amended complaint, plaintiffs assert that HUD's recapture of overpaid grant funds through the reduction of subsequent years' grants was accomplished without legal authority and therefore amounts to an illegal exaction.  Aerolineas Argentinas v. United States, 77 F.3d 1564, 1572–73 (Fed. Cir. 1996) (recognizing that an illegal exaction claim may be heard in this court where a plaintiff alleges that it "'paid money over to the Government, directly or in effect, and seeks return of all or part of that sum' that 'was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation'") (quoting Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007 (Ct. Cl. 1967)).  Plaintiffs maintain that the exaction at issue was the direct result of a misapplication of law—specifically HUD's failure to abide by the terms of NAHASDA in recapturing plaintiffs' grant funds—and that the remedy for such violation is a return of the money unlawfully exacted.  Pennoni v. United States, 79 Fed. Cl. 552, 561 (2007).  Defendant has moved to dismiss count two on the ground that HUD acted properly in recapturing those funds.  At the heart of

---

[3]  Pursuant to our earlier ruling on the statute of limitations, claims arising from overpayments recaptured more than six years before the November 26, 2008, filing of plaintiffs' complaint in this court are out of time.

[4]  In addition to the overpayments received by plaintiffs, HUD determined that the misapplication of the grant allocation formula had also resulted in certain underpayments to plaintiffs, specifically an underpayment of $102,312 to the Lummi Tribe, $91,921 to the Fort Berthold Housing Authority, and $381,868 to the Hopi Tribal Housing Authority.  These amounts were later offset against outstanding overpayments.

defendant's motion, then, is a single question:  Is HUD permitted to recover grant funds through an administrative offset, without following the procedures set forth in NAHASDA, once those grant funds have been disbursed and expended on affordable housing activities?

In plaintiffs' view, the answer is no.  Plaintiffs argue that Title IV of NAHASDA, 25 U.S.C. §§ 4161–4168, provides a comprehensive and exclusive scheme for the administration of grant funds and that Congress, by setting forth the remedies available to HUD under this title, expressed its intention to bar all other remedies.  Alexander v. Sandoval, 532 U.S. 275, 290 (2001) (observing that "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others"); Transamerica Mortg. Advisors, Inc. v. Lewis, 444 U.S. 11, 19 (1979) (recognizing that "[i]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."); American Bus Ass'n v. Slater, 231 F.3d 1, 4 (D.C. Cir. 2000) (concluding that a statute's enumerated remedies reveal Congress's unambiguous intent that such remedies be exclusive).  In particular, plaintiffs maintain that NAHASDA authorizes HUD to recapture an overpayment of grant funds in one of only two ways:  either by reducing payments to a grant recipient as indicated in Section 401 of NAHASDA (codified at 25 U.S.C. § 4161), or by adjusting the amount of a grant as indicated in Section 405 of NAHASDA (codified at 25 U.S.C. § 4165).  Plaintiffs maintain, however, that under either section, HUD is required to satisfy the notice and hearing provisions of 24 C.F.R. §§ 1000.532 and 1000.540, and may recover grant funds only if the agency determines that a grant recipient has failed to comply substantially with some provision of NAHASDA and has not already expended the grant funds on affordable housing activities in accordance with the statute.  Absent the satisfaction of these conditions—which the parties agree did not occur here—plaintiffs contend that HUD's recovery of grant funds is devoid of legal authority and therefore amounts to an illegal exaction.

Plaintiffs' argument begins with Section 401 of NAHASDA, a provision that, by the terms of its title, sets forth HUD's "Remedies for noncompliance."  Section 401(a) provides in relevant part as follows:

**Actions by Secretary affecting grant amounts**

**(1)  In general**

Except as provided in subsection (b) of this section [involving substantial noncompliance resulting from the technical incapacity of a grant recipient], if the Secretary finds after reasonable notice and opportunity for hearing that a recipient of assistance under this

chapter has failed to comply substantially with any provision of this chapter,  the Secretary shall—

\*   \*   \*   \*   \*

**(B)**   reduce payments under this chapter to the recipient  by an amount equal to the amount of such payments that were not expended in accordance with this chapter; . . . .

25 U.S.C. § 4161(a).  Although the statute does not define when noncompliance is substantial, HUD has done so in NAHASDA's implementing regulations as follows:

HUD will review the circumstances of each noncompliance with NAHASDA and the regulations on a case-by-case basis to determine if the noncompliance is substantial. This review is a two step process. First, there must be a noncompliance with NAHASDA or these regulations. Second, the noncompliance must be substantial. A noncompliance is substantial if:

(a) The noncompliance has a material effect on the recipient meeting its major goals and objectives as described in its Indian Housing Plan;

(b) The noncompliance represents a material pattern or practice of activities constituting willful noncompliance with a particular provision of NAHASDA or the regulations, even if a single instance of noncompliance would not be substantial;

(c) The noncompliance involves the obligation or expenditure of a material amount of the NAHASDA funds budgeted by the recipient for a material activity; or

(d) The noncompliance places the housing program at substantial risk of fraud, waste or abuse.

24 C.F.R. § 1000.534.

In plaintiffs' view, HUD may not take action under Section 401 until it finds, on the basis of a hearing, that a grant recipient has failed to comply substantially with some provision of NAHASDA or its regulations, in this case with 24 C.F.R. § 1000.318 (the regulation outlining the appropriate treatment of FCAS).

6

In addition, plaintiffs read Section 401 as limiting the recovery of grant funds to "the amount of such payments that were not expended in accordance with this chapter." That limitation, plaintiffs argue, prohibits HUD from recapturing grant funds that have been expended on eligible, affordable housing activities, defined in Section 202 of NAHASDA as activities "to develop, operate, maintain, or support affordable housing for rental or homeownership, or to provide housing services with respect to affordable housing." 25 U.S.C. § 4132. Plaintiffs thus maintain that HUD's recapture of their grant funds was not authorized under Section 401 because HUD: (1) failed to provide them with an opportunity for a hearing; (2) made no finding that they had "failed to comply substantially" with 24 C.F.R. § 1000.318 (or any other provision of NAHASDA); and (3) recaptured, through the offset of subsequent years' grants, payments that had already been spent "in accordance with" NAHASDA.

Nor, plaintiffs argue, did HUD satisfy the terms of Section 405, the only other NAHASDA provision addressing the adjustment of grant funds. Section 405, titled "Review and audit by Secretary," authorizes HUD to conduct reviews and audits to determine whether a grant recipient is carrying out eligible activities in a timely manner and in compliance with its housing plan. 25 U.S.C. § 4165. Section 405 sets out the remedies HUD may pursue following such an audit as follows:

**Effect of reviews**

Subject to section 4161(a) of this title, after reviewing the reports and audits relating to a recipient that are submitted to the Secretary under this section, the Secretary may adjust the amount of a grant made to a recipient under this chapter in accordance with the findings of the Secretary with respect to those reports and audits.

25 U.S.C. § 4165(d).

Plaintiffs point out, however, that HUD's authority to adjust grants under Section 405 is "[s]ubject to section 4161(a)," a phrase plaintiffs interpret as imposing the same requirements found in Section 401—specifically the notice, hearing, and substantial noncompliance requirements—as a precondition to action under Section 405. Just as with Section 401, in other words, plaintiffs read Section 405 as authorizing HUD to adjust grant amounts only after the agency has provided a grant recipient with notice and the opportunity for a hearing and has found the recipient to be in substantial noncompliance with NAHASDA.

The adjustment of grants under Section 405 is further limited, plaintiffs argue, by 24 C.F.R. § 1000.532, a regulation promulgated as part of the first negotiated rulemaking following the enactment of NAHASDA. 63 Fed. Reg. 12334, 12371 (Mar. 12, 1998). That regulation, in plaintiffs' view, requires HUD to provide the

opportunity for a hearing whenever the agency adjusts a grant amount after an audit under Section 405 and explicitly prohibits the recapture of NAHASDA funds that have been expended on affordable housing activities. Section 1000.532, titled "What are the adjustments HUD makes to a recipient's future year's grant amount under section 405 of NAHASDA?," reads in relevant part as follows:

> (a)  HUD may, subject to the procedures in paragraph (b) below, make appropriate adjustments in the amount of the annual grants under NAHASDA in accordance with the findings of HUD pursuant to reviews and audits under section 405 of NAHASDA. HUD may adjust, reduce, or withdraw grant amounts, or take other action as appropriate in accordance with the reviews and audits, except that grant amounts already expended on affordable housing activities may not be recaptured or deducted from future assistance provided on behalf of an Indian tribe.

> (b)  Before undertaking any action in accordance with paragraphs (a) and (c) of this section, HUD will notify the recipient in writing of the actions it intends to take and provide the recipient an opportunity for an informal meeting to resolve the deficiency. In the event the deficiency is not resolved, HUD may take any of the actions available under paragraphs (a) and (c) of this section. However, the recipient may request, within 30 days of notice of the action, a hearing in accordance with § 1000.540.

24 C.F.R. § 1000.532.[5]

Plaintiffs thus argue that HUD, whether acting under Section 401 or Section 405,[6] must provide a grant recipient with notice and the opportunity for a hearing,

---

[5]  24 C.F.R. § 1000.540, a regulation cited by plaintiffs in support of their claim, in turn directs HUD to employ the hearing procedures set forth in 24 C.F.R. Part 26 when conducting a hearing under NAHASDA. See, e.g., 24 C.F.R. § 26.2 (requiring an Administrative Law Judge to serve as the hearing officer); 24 C.F.R. § 26.46 (anticipating the calling of witnesses). That regulation, however, sets forth the procedures to be followed if a hearing is required, but does not address the question of when a hearing is required in the first instance.

[6]  Plaintiffs indicated at oral argument that they believe that Section 405 is the applicable section in this case because HUD acted pursuant to an audit conducted at the direction of HUD's Office of Inspector General to determine whether grant

(continued...)

and may adjust grant funds only if the agency has determined that the grant recipient is in substantial noncompliance with NAHASDA and, even then, only if the funds to be recaptured were misspent by the grant recipient, i.e., "not expended in accordance with" NAHASDA.[7]  Sections 401 and 405, in other words, do not allow HUD to recapture NAHASDA funds that are improvidently allocated by HUD, but spent by a grant recipient in accordance with the statute.  Actions taken outside of this framework, plaintiffs maintain, go beyond HUD's delegated authority and consequently amount to an illegal exaction.

Defendant, for its part, rejects plaintiffs' characterization of their claim. In defendant's view, the misallocation of grant funds is not an issue of a grant recipient's compliance with NAHASDA that should be addressed under Title IV (Sections 401 and 405), but rather of HUD's own failure to comply with the statute, specifically with the agency's obligation to pay grant recipients in accordance with the formula established by negotiated rulemaking as set forth in Title III, 25 U.S.C. § 4151.[8]  HUD's recovery of grant overpayments, in other words, was an action the agency took to address HUD's own noncompliance with NAHASDA, and accordingly involved none of the enforcement provisions set out in Sections 401 and 405.

---

[6](...continued)
recipients had included ineligible housing units in the information they had provided to HUD.  The question of whether HUD should have proceeded under Section 401 or Section 405, however, does not alter plaintiffs' analysis, given plaintiffs' position that Section 405 contains the same notice, hearing, and substantial noncompliance requirements as Section 401.  Under either section, plaintiffs maintain, HUD failed to meet the criteria for retroactively adjusting plaintiffs' grant funds.

[7] The record at present contains no evidence as to whether the grant funds in question were "expended in accordance with" NAHASDA; such an issue, plaintiffs maintain, is precisely one that would have been addressed in a hearing conducted under Section 401 or 405.

[8]  25 U.S.C. § 4151, titled "Annual allocation," provides as follows:

For each fiscal year, the Secretary shall allocate any amounts made available for assistance under this chapter for the fiscal year, in accordance with the formula established pursuant to section 4152 of this title, among Indian tribes that comply with the requirements under this chapter for a grant under this chapter.

9

Indeed, defendant maintains that Sections 401 and 405 do not, by their terms, apply in the instant case at all. In defendant's view, Section 401 is directed toward one specific situation: where a grant recipient has engaged in substantial noncompliance with NAHASDA. Defendant argues, however, that the action that gave rise to the overpayments here—the inclusion of ineligible FCAS in the allocation formula in violation of 24 C.F.R. § 1000.318—is not considered a compliance issue, but is treated instead as a data error.[9] In other words, defendant argues, plaintiffs are not believed to be in substantial noncompliance with NAHASDA and their case therefore does not fall within the notice and hearing requirements of Section 401.[10]

Similarly, defendant interprets Section 405 as applying only to: (1) audits under chapter 75 of title 31 of the United States Code (examining issues such as whether the financial statements of the audited entity have been prepared in accordance with generally accepted accounting principles); and (2) reviews and audits by HUD to determine whether the grant recipient has carried out eligible activities, has a continuing capacity to carry out eligible activities in a timely manner, and is in compliance with the Indian housing plan submitted pursuant to 25 U.S.C. § 4112. In defendant's view, however, HUD has not performed a review or audit that meets either criterion, making Section 405—and its accompanying regulation, 24 C.F.R. § 1000.532—inapplicable to this dispute.

Nor, defendant argues, are plaintiffs correct that Section 405 contains the same notice, hearing, and substantial noncompliance requirements as Section 401. In defendant's view, Section 405's introductory phrase "[s]ubject to section 4161(a)"

---

[9] Defendant's position is consistent with the approach HUD took in recovering the overpaid grant funds. The record indicates that HUD considered the inclusion of ineligible FCAS to be analogous to a data error and therefore used as its guide the challenge and appeal procedures set forth in 24 C.F.R. § 1000.336 (dealing with data errors) in recovering the overpaid grant funds. Notably, 24 C.F.R. § 1000.336 was later amended through a four-year, consensus rulemaking process to include FCAS challenges as an issue to be addressed under that regulation. 72 Fed. Reg. 20018, 20025–26 (Apr. 20, 2007); 24 C.F.R. § 1000.336(a)(4) ("An Indian tribe, [Tribally Designated Housing Entity], or HUD may challenge data used in the [Indian Housing Block Grant] Formula and HUD formula determinations regarding: . . . (4) Formula Current Assisted Stock (FCAS) . . . .)

[10] Plaintiffs do not contend that they were in substantial noncompliance with NAHASDA or its regulations; rather, they take the position that grant funds may not be adjusted retroactively under NAHASDA in the absence of substantial noncompliance.

does not—as plaintiffs contend—import Section 401's requirements into Section 405, but rather excludes from the scope of Section 405 cases that fall under Section 401, i.e., cases involving substantial noncompliance.  Defendant thus maintains that the Secretary of HUD may exercise discretionary authority under Section 405 except in situations where HUD finds substantial noncompliance under Section 401 (thereby requiring notice, the opportunity for a hearing, and mandatory enforcement by HUD).

Given this interpretation of NAHASDA and its accompanying regulations, defendant maintains that the statute simply does not reach the situation now before us: the agency's correction of a grant-funding error to recover overpayments improvidently made by HUD.  Defendant instead sees HUD as having exercised what defendant describes as the government's "inherent authority" to recover sums erroneously paid—a common law right, defendant maintains, that exists irrespective of any limitations on recapture contained in NAHASDA or its implementing regulations.

In defendant's view, HUD, like all government agencies, has an inherent authority recognized by the Supreme Court to recover funds that the agency has "wrongfully, erroneously, or illegally paid."  United States v. Wurts, 303 U.S. 414, 415 (1938).  Further, defendant maintains that "[n]o statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute." Id. (quoting United States v. Bank of the Metropolis, 40 U.S. 377, 401 (1841)).  Such authority is based upon "the principle that parties receiving moneys illegally paid by a public officer are liable *ex aequo et bono* [i.e., in justice and fairness] to refund them." Barrett Ref. Corp. v. United States, 242 F.3d 1055, 1064 (Fed. Cir. 2001) (quoting Wisconsin Cent. R.R. Co. v. United States, 164 U.S. 190, 212 (1896)).  Nor, defendant contends, must HUD file suit to establish the illegality of the payment, but may instead offset the debt administratively from amounts otherwise owed to the debtor.  United States v. Munsey Trust Co., 332 U.S. 234, 239 (1947) (recognizing that "[t]he government has the same right 'which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him.'") (quoting Gratiot v. United States, 40 U.S. 336, 370 (1841)).  Defendant thus argues that HUD's administrative offset of grant funds was a lawful exercise of the agency's common law right—one that exists wholly outside the parameters of NAHASDA.

## II.

We cannot accept defendant's argument.  Although defendant insists that Sections 401 and 405 of NAHASDA do not govern HUD's actions in this case and that HUD at no time implemented a sanction thereunder, we read Section 405 as

addressing the situation at hand.  Section 405, titled "Review and audit by Secretary," provides in relevant part as follows:

**(a)  Requirements under chapter 75 of Title 31**

An entity designated by an Indian tribe as a housing entity shall be treated, for purposes of chapter 75 of Title 31, as a non-Federal entity that is subject to the audit requirements that apply to non-Federal entities under that chapter.

**(b)  Additional reviews and audits**

**(1)  In general**

In addition to any audit or review under subsection (a) of this section, to the extent the Secretary determines such action to be appropriate, the Secretary may conduct an audit or review of a recipient in order to—

**(A)**  determine whether the recipient–

**(i)**  has carried out–

**(I)**  eligible activities in a timely manner; and

**(II)**  eligible activities and certification in accordance with this chapter and other applicable law;

**(ii)** has a continuing capacity to carry out eligible activities in a timely manner; and

**(iii)**  is in compliance with the Indian housing plan of the recipient; and

**(B)**  verify the accuracy of information contained in any performance report submitted by the recipient under section 4164 of this title.

25 U.S.C. § 4165.

As indicated above, defendant reads this section as applying only to a narrow category of reviews and audits conducted by HUD.  We, however, read Section 405 as conferring broad authority on the Secretary to review a grant recipient's performance under NAHASDA, including monitoring a grant recipient's compliance with its Indian housing plan and verifying the accuracy of the recipient's performance reports—the two primary program documents submitted by a grant recipient.

25 U.S.C. § 4165(b)(1)(A)(iii), (B).  In the instant case, HUD acted pursuant to an audit conducted at the direction of HUD's Office of Inspector General to determine whether ineligible housing had been included in the allocation formula.  Such a review, we believe, comes within Section 405's broad mandate to ensure that the grant program is being conducted in accordance with NAHASDA.  See, e.g., 25 U.S.C. § 4165(b)(1)(A)(i)(II) (authorizing review "to determine whether the recipient has carried out eligible activities . . . in accordance with this chapter").[11]  In addition, HUD ultimately characterized as ineligible for grant purposes housing units that plaintiffs contend should properly have been included as FCAS, a dispute that should have been the subject of a hearing and not the object of unilateral resolution by HUD.

---

[11] Indeed, the distinction defendant draws between actions purportedly taken under Title III to ensure HUD's compliance with NAHASDA and actions taken under Title IV to ensure a grant recipient's compliance with NAHASDA is an artificial one that is not borne out by NAHASDA's implementing regulations.  The regulations make clear that the grant recipient, the grant beneficiary, and HUD all share responsibility for monitoring activities under NAHASDA. 24 C.F.R. §1000.501.  In particular, a grant recipient "is responsible for monitoring grant activities, ensuring compliance with applicable Federal requirements and monitoring performance goals under the [Indian Housing Plan]"; "for preparing at least annually . . . a performance report covering the assessment of program progress and goal attainment under the [Indian Housing Plan]"; and for conducting "an evaluation of the recipient's performance in accordance with performance objectives and measures."  24 C.F.R. § 1000.502(a).  HUD is charged under this same regulation with reviewing the recipient as set forth in §1000.520, a regulation that calls for HUD's review of each grant recipient's performance, at least annually, to determine whether the recipient has met the same standards identified in Section 405 (i.e., has carried out its eligible activities in a timely manner and in accordance with the requirements and the primary objective of NAHASDA and with other applicable laws;  has a continuing capacity to carry out those activities in a timely manner; has complied with the Indian Housing Plan; and has submitted accurate performance reports).  24 C.F.R. § 1000.502(c).  HUD may, in conducting this review, consider a wide array of information, including reports prepared by the recipient, records maintained by the recipient, and any other reliable relevant information which relates to the performance measures under 24 C.F.R. §1000.524.  We therefore do not construe Title IV remedies as directed exclusively toward grant recipient compliance; rather we see HUD and grant recipients working together under Title IV and its accompanying regulations to ensure the success of the NAHASDA program.

That defendant reads this section too narrowly is evidenced by NAHASDA's implementing regulations. Those regulations, as originally proposed,[12] directed that a grant recipient indicate the number of units removed from its FCAS inventory in the recipient's Annual Performance Report—a report whose accuracy Section 405 review is designed to ensure. 25 U.S.C. § 4165(b)(1)(B) (authorizing review to "verify the accuracy of information contained in any performance report"). Because of timing considerations, however, the final version of the implementing regulations specified that such information should instead be included in a grant recipient's Formula Response Form. 63 Fed. Reg. 12364–65 (Mar. 12, 1998) (setting forth final rule 24 C.F.R. §1000.302, which defines a Formula Response Form as "the form recipients use to report changes to their Formula Current Assisted stock, formula area, and other formula related information before each year's formula allocation"). As explained in the committee notes accompanying the final rule:

> The Committee added a definition of "Formula Response Form" to reflect the changes made elsewhere in the rule. The proposed rule would have required data for the formula to be included in the [Indian Housing Plan]. However, because the data is needed before the [Indian Housing Plan] submission date, the Committee decided to require formula data to be submitted on a separate form.

63 Fed. Reg. 12341–42; see also 24 C.F.R. § 1000.315 (2007) (clarifying that the Formula Response Form is the only mechanism a recipient may use to report changes to the number of FCAS).

The fact that FCAS information is included in a separate form due to administrative necessity does not, in our view, take the review of FCAS outside the purview of Section 405.  Indeed, a later regulation specified that "[r]eview of FCAS will be accomplished by HUD as a component of A–133 audits, routine monitoring, FCAS target monitoring, or other reviews." 24 C.F.R. § 1000.319(d) (2007). Given this framework, we think it evident that HUD's audit of plaintiffs' FCAS counts,

---

[12] 24 C.F.R. §1000.334, as originally proposed, provided in full as follows:

How will the formula allocation be affected if an Indian tribe or [Tribally Designated Housing Entity] removes some or all of its Formula Current Assisted Stock from inventory?

The formula allocation will be reduced by the number of units removed from the inventory. Such information shall be indicated through the Annual Performance Report.

62 Fed. Reg. 35743 (July 2, 1997).

14

conducted at the direction of the OIG, falls squarely within the agency's authority under Section 405.[13]

Because we conclude that Section 405 applies in the instant case, we further conclude that HUD was not free to disregard the requirements of that section in favor of a common law remedy with no apparent rules or limitations.[14] Resort to federal

---

[13]  HUD revised its regulations in 2007 to specify that if a grant recipient receives an overpayment of funds because it fails to report FCAS changes on the Formula Response Form in a timely manner, the recipient must repay the funds within five fiscal years. 24 C.F.R. § 1000.319(b). In addition, Congress amended Section 401 the following year to indicate that a failure to report FCAS correctly does not, in itself, constitute substantial noncompliance. Native American Housing Assistance and Self-Determination Reauthorization Act of 2008, Pub. L. No. 110–411, 122 Stat. 4319 (2008) (codified at 25 U.S.C. § 4161(a)(2)) (specifying that "[t]he failure of a recipient to comply with the requirements of section 4152(b)(1) of this title regarding the reporting of low-income dwelling units shall not, in itself, be considered to be substantial noncompliance for purposes of this subchapter."). Neither of these developments, however, means that FCAS issues that come to light as the result of an audit fall outside of Section 405. And while Section 1000.319's requirement that grant recipients repay overpaid grant funds within five years arguably conflicts with Section 1000.532's prohibition on the recapture of grant amounts already expended on affordable housing activities, the new regulation was not yet in place when plaintiffs' grant funds were recaptured, and thus, the reconciliation of these provisions must await another day.

[14] Because we conclude that Section 405 is applicable in the present case, we need not reach the issue of whether a common law right to recover money erroneously paid, through administrative offset, exists in situations not covered by the statute (as, for instance, where the agency makes a unilateral mistake by erroneously inserting an additional digit into a payment amount) or whether, as plaintiffs maintain, NAHASDA displaces any such right "through the establishment of a comprehensive regulatory program supervised by an expert administrative agency." City of Milwaukee v. Illinois and Michigan, 451 U.S. 304, 317 (1981). We observe, however, that the cases plaintiffs cite for the proposition that courts should read the enumeration of remedies in a statute as precluding other remedies—see, e.g., Alexander, 532 U.S. at 290; Transamerica Mortg., 444 U.S. at 19; American Bus, 231 F.3d at 4—do not involve the displacement of a preexisting common law right. We therefore do not accept the contention that NAHASDA's enumeration of certain remedies necessarily precludes the exercise of an additional, common law remedy in all circumstances. Rather, "[t]he test for whether congressional legislation excludes
(continued...)

common law is appropriate only when a statute does not speak to an issue.  City of Milwaukee v. Illinois and Michigan, 451 U.S. 304, 319 n.14 (1981) (recognizing that "federal courts create federal common law only as a necessary expedient when problems requiring federal answers are not addressed by federal statutory law").  But where, as here, Congress has spoken to the question, HUD may not circumvent that statutory scheme.  American Elec. Power Co. v. Connecticut, ___ U.S. ___, 131 S.Ct. 2527, 2537 (2011) ("[W]hen Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of law-making by federal courts disappears.") (quoting City of Milwaukee, 451 U.S. at 314).  In the present case, we believe Section 405—and not federal common law—governs the situation at hand.

The decision in City of Kansas City v. United States Dep't of Housing and Urban Dev., 861 F.2d 739, 743 (D.C. Cir. 1988), is instructive on this point.  In discussing the importance of the procedural requirements set forth in the Housing and Community Development Act of 1974 ("CDBG"), 42 U.S.C. § 5304(d) (1982 & Supp. IV 1986)—an act whose enforcement provisions contain essentially the same language as NAHASDA's Sections 401 and 405—the court observed that such protections play "a critical role" in the statutory scheme because they "ensure that a city legally entitled to an annual CDBG grant will not be precipitously deprived of funding pursuant to arbitrary action by HUD."  Id. at 744 (internal quotation omitted).  Of particular relevance to the instant case, the court pointed out that "[i]n most cases, Congress has been silent on the question of a grantee's procedural rights when an agency decides to terminate some or all of its federal grant. When, as in this case, Congress has not been silent, a court has a special obligation to ensure that the agency does not end-run the clear procedural protections which Congress provided."  Id. at 745 (internal quotation and citation omitted).  The court continued as follows:

The Secretary cannot ignore the notice and hearing provisions of section 111 [the section corresponding to NAHASDA's Section 401] simply because he prefers the more informal procedures of section 104(d) [the section corresponding to NAHASDA's Section 405]. HUD's own report admits that HUD has used section 104 in order to "avoid[ ] the more detailed and rigorous procedural standards of Section 111."  This application of the statute plainly violates congressional intent. As we have previously noted, "[w]hen a statute dictates that parties receive notice and a hearing . . .  the provision of

---

[14](...continued)
the declaration of federal common law is simply whether the statute speaks directly to the question at issue." American Elec. Power Co. v. Connecticut, ___ U.S. ___, 131 S.Ct. 2527, 2537 (2011); Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625 (1978).

those basic procedural rights is not left to be decided by administrative 'flexibility' or 'discretion.' " In the district court's words, section 111 would be a "nullity" if the Secretary could avoid it whenever he chose, as he has for fourteen years, by using section 104(d) instead.

Id. at 744 (citations omitted).  Analogously, we do not believe that HUD can ignore the requirements of Section 405 simply because the agency prefers the more informal procedures of a common law offset.

We cannot, however, accept plaintiffs' assertion that Section 405's introductory phrase "[s]ubject to section 4161(a)" imports the substantial noncompliance provision of Section 401 into actions taken under Section 405. Rather, we read this language as indicating that compliance issues must be addressed under Section 401 and not under Section 405.  In other words, defendant is correct that the phrase "[s]ubject to section 4161(a)" excludes the scope of Section 401 from Section 405.  Shell Oil Co. v. Manley Oil Corp.,124 F.2d 714, 716 (7th Cir. 1941) (observing that "[t]he words 'subject to,' used in their ordinary sense, mean 'subordinate to,' 'subservient to' or 'limited by.'").

Such a conclusion follows from the structure of the statute itself.  Section 401, by the terms of its title, deals with "Remedies for noncompliance."  That section provides for nondiscretionary action by the Secretary ("the Secretary shall . . . "), procedural safeguards, and the explicit requirement that the agency make a finding of noncompliance before imposing the section's drastic sanctions (including a termination of all grant funding and the removal of a grant recipient from the program).  25 U.S.C. § 4161.  Section 405, by contrast, allows for discretionary enforcement authority pursuant to specific reviews. 25 U.S.C. § 4165.  What distinguishes the two statutory sections, in other words, is the culpability of the grant recipient, the discretion of the Secretary,  and the nature and severity of the sanctions imposed.  It would make no sense for both sections to operate only where the grant recipient is in substantial noncompliance.  Otherwise, the more lenient standards of Section 405 would swallow up Section 401.[15]

---

[15] Congress added the introductory phrase "[s]ubject to section 4161(a)" to the statute in 2000 as part of an amendment to Section 405.  Pub. L. No. 106-568, 114 Stat. 2868 (2000); Pub. L. No. 106-569, 114 Stat. 2944 (2000).  As originally enacted in 1996, the enforcement provision of Section 405 read, prior to codification, as follows:

Effect of reviews—The Secretary may make appropriate adjustments in the amount of the annual grants under this Act in accordance with

(continued...)

Despite our conclusion that Section 405 does not incorporate a substantial noncompliance requirement by reference to Section 401, we nevertheless observe that Section 405 contains its own hearing requirement, set forth in the regulations. 24 C.F.R. § 1000.532 requires HUD to provide the opportunity for a hearing whenever the agency adjusts a grant amount after an audit under Section 405 and explicitly prohibits the recapture of NAHASDA funds that have already been expended on affordable housing activities. Providing plaintiffs with the opportunity for a hearing in this case before adjusting their grant amounts was therefore something HUD was required—but failed—to do.

Recognizing that HUD must comply with the statutory and regulatory regime in providing hearings before reducing grant amounts is consistent with the legislative history of NAHASDA and its implementing regulations. From the outset, both the NAHASDA program and the promulgation of the rules implementing that program were designed to be collaborative. In Section 106(b)(2) of NAHASDA , for instance, Congress directed  HUD to develop NAHASDA's implementing regulations with active tribal participation by using the procedures of the Negotiated Rulemaking Act of 1990, as amended, 5 U.S.C. §§ 561–570. 62 Fed. Reg. 35718 (July 2, 1997). Pursuant to this direction,  the Secretary of HUD established the Native American Housing Assistance and Self-Determination Negotiated Rulemaking Committee—made up of 48 Indian tribes, ten HUD representatives, and three individuals from the Federal Mediation and Conciliation Service—to negotiate and develop proposed rules implementing NAHASDA. At the recommendation of tribal

---

[15](...continued)
the findings of the Secretary pursuant to reviews and audits under this section.  The Secretary may adjust, reduce, or withdraw grant amounts, or take other action as appropriate in accordance with the reviews and audits of the Secretary under this section, except that grant amounts already expended on affordable housing activities may not be recaptured or deducted from future assistance provided on behalf of an Indian tribe.

Pub. L. No. 104-330, 110 Stat. 4016 (1996). It is not clear from the legislative record why this change was made, and the parties were unable to provide an explanation. What is clear, however, is that the accompanying regulation—24 C.F.R. § 1000.532(a) (requiring a hearing and explicitly prohibiting HUD from recapturing or deducting from future assistance grant funds that have "already [been] expended on affordable housing activities")—remains in force.

leaders, the committee agreed to operate based on consensus rulemaking,[16] and HUD committed to using, to the maximum extent feasible consistent with its legal obligations, all consensus decisions as the basis for the proposed rules.  Id. at 35719.

During the first round of rulemaking in 1997, HUD took the position that the agency was permitted to recapture grant funds under Section 405 without providing prior notice and the opportunity for hearing and accordingly drafted a proposed rule that provided for neither.  Id. at 35746 (proposed Section 1000.528).  Tribal reaction to HUD's proposed rule, however, was unanimously hostile.  63 Fed. Reg. 12334, 12347 (Mar. 12, 1998).  As a result, the final rule stated that "HUD will [in cases brought under Section 405] . . . provide the recipient with a hearing identical to that afforded recipients under section 401(a) of NAHASDA."  Id.[17]  Two conclusions thus appear evident from the legislative record: first, that Congress intended active involvement by the Indian tribes in the promulgation of NAHASDA's implementing regulations and second, that the tribes perceived hearings as an important part of their procedural rights.

Requiring HUD to observe this additional level of procedural protection makes sense since the NAHASDA program is designed to protect the Indians.  25 U.S.C. § 4101 sets forth congressional findings regarding NAHASDA.  In particular, Congress found  that "there exists a unique relationship between the Government of the United States and the governments of Indian tribes"

---

[16] The protocols adopted by the committee defined "consensus" as "general agreement demonstrated by the absence of expressed disagreement by a Committee member in regards to a particular issue."  62 Fed. Reg. 35719.

[17]  As explained more fully in the Federal Register, the proposed rule implementing Section 405(c), as drafted by HUD, "did not provide notice and an opportunity for hearing."  Id.  The Federal Register continues as follows:

> Extensive comments were received which unanimously supported the tribal position that the Department afford notice and an opportunity for hearing prior to the Department taking the section 405(c) remedies against the future year grant. The final rule states HUD will (1) provide notice and an informal meeting to resolve program deficiencies prior to taking the section 405(c) remedies and following the future grant adjustment, reduction, withdrawal, or other action, and (2) provide the recipient with a hearing identical to that afforded recipients under section 401(a) of NAHASDA.

Id.

19

(Section 4101(2)); that "the United States has undertaken a unique trust responsibility to protect and support Indian tribes and Indian people" (Section 4101(3)); that "the need for affordable homes in safe and healthy environments on Indian reservations . . . is acute" (Section 4101(6)); and that "providing affordable homes in safe and healthy environments is an essential element in the special role of the United States in helping Indian tribes and their members to improve their housing conditions and socioeconomic status" (Section 4101(5)).  See also 24 C.F.R. §1000.2 (directing that these congressional findings be used as the guiding principles in the implementation of NAHASDA).  Reducing a present year's grant to recover past funds misallocated by HUD (but spent correctly by the tribe) contravenes these goals.  See, e.g., Bell v. New Jersey, 461 U.S. 773, 783 n.8 (1983) (recognizing that the beneficiaries of grant funds suffer where a reduction in grant funds to remedy past deficiencies leads to a corresponding reduction in program services).

In conclusion, we read Section 405 as governing HUD's actions and thus as precluding HUD from exercising any common law right the agency might otherwise possess under circumstances not directly addressed by the statute.  We further read that section as applying only in cases that do not involve a grant recipient's substantial noncompliance with NAHASDA (which would fall instead under Section 401).  In addition, we construe Section 405's implementing regulations as requiring the Secretary to provide notice and the opportunity for a hearing before making an adjustment to a recipient's grant amounts and as preventing the Secretary from recapturing grant amounts already expended on affordable housing activities.  To conclude otherwise would allow HUD to deny grant recipients the protections Congress has afforded them when faced with a reduction in their grant funding, would further allow the agency to circumvent a process put into place by consensus rulemaking at the direction of Congress, and would lead to the anomalous result that a grant recipient in substantial noncompliance with NAHASDA would receive greater procedural protections before experiencing a recapture of their grant funds than recipients in full compliance (a target for recapture through a fault of HUD's rather than their own).  We are unwilling to endorse such an unsatisfactory result.

CONCLUSION

For the reasons set forth above, defendant's motion to dismiss plaintiffs' second claim for relief is DENIED.

s/John P. Wiese
John P. Wiese
Senior Judge

20