# In the United States Court of Federal Claims

No. 08-848C
Filed: August 29, 2013

LUMMI TRIBE OF THE LUMMI RESERVATION, LUMMI NATION HOUSING AUTHORITY, FORT BERTHOLD HOUSING AUTHORITY, AND HOPI TRIBAL HOUSING AUTHORITY,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

Native American Housing Assistance and Self-Determination Act of 1996, 25 U.S.C. §§ 4101–4212 (2006): 24 C.F.R. § 1000.318, a regulation directing the Department of Housing and Urban Development to remove housing units that are no longer owned or operated by a tribe from the Formula Current Assisted Stock component of the tribe's funding calculation, does not conflict with the statutory mandate, found at 25 U.S.C. § 4152(b)(1), that the allocation formula be based on housing units a tribe owned or operated as of September 30, 1997.

John Fredericks, III, Fredericks Peebles & Morgan LLP, Mandan, ND, counsel for plaintiffs.

Michael N. O'Connell, with whom were Assistant Attorney General Stuart F. Delery, Director Jeanne E. Davidson, and Assistant Director Donald E. Kinner, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, counsel for defendant.

**OPINION**

WIESE, Senior Judge.

This case arises under the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA" or "the statute"), as amended, 25 U.S.C. §§ 4101–4212 (2006). Plaintiffs sue here to recover grant funds initially paid to them under the statute but later recaptured by the Department of Housing and Urban Development ("HUD" or "the agency") when HUD determined that the allocation formula on which the grants had been based had been misapplied. This

action is currently before the court on the parties cross-motions for partial summary judgment.[1] By direction of the court, the parties have fully briefed only those arguments addressing the issue of whether 25 U.S.C. § 4152(b)(1), as originally enacted, prohibited HUD from excluding the housing units referenced in the statute from the allocation formula, rendering 24 C.F.R. § 1000.318's removal of such units contrary to the statute and therefore invalid.[2]

---

[1] In the initial round of litigation in this case, the court issued an opinion on August 4, 2011, holding that NAHASDA is a money-mandating statute whose implementing regulations may be challenged by plaintiffs in this court, and that the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A), does not prevent the court from awarding the relief sought. Lummi Tribe of the Lummi Reservation v. United States, 99 Fed. Cl. 584, 597, 605 (2011) ("Lummi I"). We additionally held that plaintiffs' claims for grant funds relating to fiscal years 1998 through 2002 accrued more than six years before plaintiffs' November 26, 2008, filing of suit in this court and were thus barred by the statute of limitations. Id. at 607. Following that decision, the court issued an order on September 29, 2011, vacating that portion of its August 4, 2011, decision dismissing plaintiffs' second claim for relief (a claim challenging HUD's recapture of grant funds in the absence of a compliance hearing) and allowing that issue to proceed with further briefing. In a second opinion issued on August 21, 2012, the court held that HUD's recapture of grant funds without conducting a compliance hearing did not comport with the applicable procedures governing the recovery of such funds. Lummi Tribe of the Lummi Reservation v. United States, 106 Fed. Cl. 623, 633 (2012) ("Lummi II"). These cross-motions represent the third—albeit not the final—round of briefing in this case.

[2] Plaintiffs' motion for partial summary judgment contains an additional issue for decision: whether HUD acted unlawfully by (1) excluding units from the allocation formula that plaintiffs still own or operate; (2) excluding units that were demolished and replaced despite the fact that the tribes continue to need funding to maintain the replaced units; and (3) reducing funding for units that were converted from homeownership to low rent after a certain date. Such actions, plaintiffs maintain, violate NAHASDA's mandate that the funding allocation be related to need. See 25 U.S.C. § 4152(b) (directing that the allocation formula "shall be based on factors that reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities"); see also United Keetoowah Band of Cherokee Indians v. HUD, 567 F.3d 1235, 1241 (10th Cir. 2009) (invalidating another of NAHASDA's implementing regulations because it did not have "some connection or nexus with . . . the need of Indian tribes" in violation of 25 U.S.C. § 4152(b)). Plaintiffs accordingly ask the court to strike down as invalid those aspects of the regulation—24 C.F.R. § 1000.318(a)(1) (requiring that housing units be conveyed "as soon as practicable after the unit becomes eligible for conveyance")

(continued...)

The court heard oral argument on July 30, 2013. For the reasons set forth below, plaintiffs' motion for partial summary judgment as it relates to the alleged invalidity of 24 C.F.R. § 1000.318 is denied and defendant's cross-motion is granted.

## FACTS[3]

Congress enacted NAHASDA in 1996 to consolidate then-existing public-housing assistance programs for Indian tribes and to replace them with a single block-grant program to address the tribes' affordable housing activities. See Pub. L. No. 104-330, § 107, 110 Stat. 4016 (1996); "Implementation of the Native American Housing Assistance and Self-Determination Act of 1996; Final Rule," 63 Fed. Reg. 12,334, 12,334–35 (Mar. 12, 1998). Consistent with this goal, NAHASDA directed the Secretary of HUD to provide annual grants to Indian tribes or tribal housing authorities in support of their need for affordable housing.

Although NAHASDA itself did not establish a formula for allocating the annual appropriation among Indian tribes, the statute authorized HUD to do so using the negotiated rulemaking procedure set forth in 5 U.S.C. §§ 561–570. 25 U.S.C. § 4152(a).[4] Congress additionally specified that such a formula must meet certain statutory requirements. In particular, 25 U.S.C. § 4152(b) directed that the allocation formula "shall be based on factors that reflect the need of the Indian tribes

---

[2](...continued)
and 24 C.F.R. § 1000.318(a)(2) (requiring that tribes "actively enforce strict compliance" by the homeowner with the terms of the homeowner agreement)—that permit HUD to base a funding allocation on factors unrelated to a tribe's need. By agreement of the parties, however, this issue has been postponed for future determination.

[3] We limit our discussion to those facts relevant to the issue currently before the court; a more comprehensive recitation of the facts can be found in our earlier decisions. Lummi I, 99 Fed. Cl. at 587–90; Lummi II, 106 Fed. Cl. at 624–25.

[4] 25 U.S.C. § 4152(a) directed as follows:

> The Secretary shall, by regulations issued not later than the expiration of the 12-month period beginning on October 26, 1996, in the manner provided under section 4116 of this title [referring to the Negotiated Rulemaking Act, 5 U.S.C. §§ 561–570] establish a formula to provide for allocating amounts available for a fiscal year for block grants under this chapter among Indian tribes in accordance with the requirements of this section.

and the Indian areas of the tribes for assistance for affordable housing activities." The statute went on to enumerate the following three factors as reflecting such need:

> (1) The number of low-income housing dwelling units owned or operated at the time pursuant to a contract between an Indian housing authority for the tribe and the Secretary.
>
> (2) The extent of poverty and economic distress and the number of Indian families within Indian areas of the tribe.
>
> (3) Other objectively measurable conditions as the Secretary and the Indian tribes may specify.

25 U.S.C. § 4152(b).

Pursuant to this statutory directive, HUD engaged in a negotiated rulemaking process with 48 representatives from the various Indian tribes. 63 Fed. Reg. 12,334. The resulting regulations—set forth at 24 C.F.R. §§ 1000.304–1000.340 (1998)—included the allocation formula identified in 25 U.S.C. § 4152(a). The allocation formula contained two components: "(a) Formula Current Assisted Housing Stock (FCAS); and (b) Need." 24 C.F.R. § 1000.310. The regulations indicated that funding was to be allocated on the basis of the FCAS component first, with the remaining funds to be allocated according to need. 24 C.F.R. § 1000.324.[5]

The regulations went on to define FCAS as the number of housing units owned or operated by a tribe as of September 30, 1997, immediately prior to the effective date of NAHASDA. 24 C.F.R. § 1000.312. The regulations additionally provided, however, that that number would be adjusted downward to account for housing units that had reached the end of their rent-to-own terms and had been conveyed to the homeowner. Specifically, 24 C.F.R. § 1000.318 directed HUD to remove from the FCAS count any housing unit that a tribe "no longer has the legal right to own, operate, or maintain . . . whether such right is lost by conveyance, demolition, or otherwise," provided that such unit was removed from a tribe's inventory "as soon as practicable after the unit becomes eligible for conveyance." 24 C.F.R. § 1000.318(a)(1).

Despite this regulatory directive, a 2001 audit by HUD's Office of Inspector General ("OIG") revealed that HUD had improperly administered the grant program by failing to exclude from the grant calculation housing units that were no longer

---

[5] Pursuant to 24 C.F.R. § 1000.324, the need component consisted of seven criteria, including the number of households without a kitchen or plumbing or with an annual income of less than a certain amount.

owned or operated by a tribe. Following the OIG's audit and at the OIG's recommendation, HUD performed audits of the program participants and concluded that the agency's failure to apply 24 C.F.R. § 1000.318 had resulted in overpayments to various tribes.[6] HUD notified the tribes and moved to recover the overpayments.

A tribal housing authority no longer involved with the present litigation brought suit in district court in Colorado, arguing, inter alia, that 24 C.F.R. § 1000.318 was invalid because it conflicted with the plain language of 25 U.S.C. § 4152(b)(1). Fort Peck Housing Auth. v. HUD, 435 F. Supp. 2d 1125, 1132 (D. Colo. 2006) ("Fort Peck I").[7] In particular, Fort Peck maintained that the statute required that the allocation formula include housing units owned or operated by the tribe on September 30, 1997, and consequently precluded HUD from excluding such units from the formula.

The district court agreed. Finding that "the text of the statute makes its meaning . . . clear," the court explained as follows:

> Congress expressly directed that the first factor in determining a tribe's need for housing assistance is the number of dwelling units for which a tribe was receiving federal assistance when NAHASDA went into effect. The use of the phrase "the number" is definitive. The statute leaves no room for the formula to include some, but not all of the number of dwelling units that a tribe owned or operated pursuant to an [Annual Contributions Contract].

Id. The court accordingly invalidated 24 C.F.R. § 1000.318 based on a literal reading of Section 4152(b)(1).

On appeal, however, the Tenth Circuit overturned the trial court's decision.

---

[6] As we noted in Lummi II, 106 Fed. Cl. at 625, HUD ultimately determined that since November 26, 2002, the Lummi Tribe had received $863,236 in overpayments, the Fort Berthold Housing Authority had received $249,689 in overpayments, and the Hopi Tribal Housing Authority had received $964,699 in overpayments as a result of the inclusion of ineligible housing units in the FCAS component of the allocation formula.

[7] Although Fort Peck Housing Authority was among the original plaintiffs in the present action, we dismissed their claim in Lummi I on the ground that 28 U.S.C. § 1500 bars this court from exercising jurisdiction over an action that is pending in the district court and is based on substantially the same operative facts as the claim before this court. Lummi I, 99 Fed. Cl. at 592 (citing United States v. Tohono O'Odham Nation, ____ U.S. ____, 131 S. Ct. 1723, 1731 (2011)).

Fort Peck Housing Auth. v. HUD, 367 F. App'x 884, 890 (10th Cir. 2010) ("Fort Peck II"). In an unpublished decision, the appellate court held that the district court's interpretation of Section 4152(b)(1) as prohibiting the reduction of housing units below the September 30, 1997, level "is inconsistent with the statute's plain language and is contrary to Congress's unambiguous intent that the funding formula relate to the needs of all tribal Housing Entities." Id. at 891.

In reaching this conclusion, the Tenth Circuit focused on the phrase "based on" in Section 4152(b), finding that the language should be interpreted as requiring that the factors enumerated in Sections 4152(b)(1)–(3) "form the basis, beginning, or starting point, of the formula." Id. at 890. The Tenth Circuit reasoned that as long as HUD considered all of the housing units identified in Section 4152(b)(1) as a starting point, HUD could then go on to exclude units from the formula under the catch-all Section 4152(b)(3) (allowing HUD to consider "[o]ther objectively measurable conditions"), in order to meet the statute's overarching mandate that the formula "reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities." Id. at 891. The court thus reversed the district court's decision and held that 24 C.F.R. § 1000.318 was valid.

Following the district court's decision in Fort Peck I, but prior to the Tenth Circuit's decision in Fort Peck II, Congress amended NAHASDA through the enactment of the Native American Housing Assistance and Self-Determination Reauthorization Act of 2008 ("Reauthorization Act" or "2008 amendments"), Pub. L. No. 110-411, § 301, 122 Stat. 4319 (2008). Particularly relevant to the pending motions, the Reauthorization Act rewrote Section 4152(b)(1) in its entirety, replacing the phrase "owned or operated at the time" (referring to the number of housing units on which the allocation formula was to be based) with "owned or operated by a recipient on the October 1 of the calendar year immediately preceding the year for which funds are provided." The amendments went on to specify that a housing unit "shall not be considered to be a low-income housing dwelling unit for purposes of this section if—(i) the recipient ceases to possess the legal right to own, operate, or maintain the unit; or (ii) the unit is lost to the recipient by conveyance, demolition, or other means," unless the unit was not conveyed to the homebuyer for reasons beyond the control of the grant recipient. 25 U.S.C. § 4152(b)(1)(A), (B). Finally, the Reauthorization Act indicated that the amendments to Section 4152(b)(1) "shall not apply to any claim arising from a formula current assisted stock calculation or count involving an Indian housing block grant allocation for any fiscal year through fiscal year 2008, if a civil action relating to the claim is filed by not later than 45 days after October 14, 2008." 25 U.S.C. § 4152(b)(1)(E). Plaintiffs brought suit in this court on November 26, 2008, in satisfaction of the statute.

## DISCUSSION

The issue now before the court is the very one decided in the tribe's favor in Fort Peck I, but decided in HUD's favor on appeal in Fort Peck II: Does 24 C.F.R. § 1000.318, by permitting HUD to remove from the FCAS component of the allocation formula housing units that are no longer owned or operated by the tribe, violate the plain statutory language of 25 U.S.C. § 4152(b)(1) directing that the allocation formula be based on "[t]he number of low-income housing dwelling units owned or operated at the time pursuant to a contract between an Indian housing authority for the tribe and the Secretary"? After careful consideration, we hold that it does not.

As indicated above, Congress identified the criteria to be used in the allocation formula in 25 U.S.C. § 4152(b) as follows:

> The formula shall be based on factors that reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities, including the following factors:
>
> (1) The number of low-income housing dwelling units owned or operated at the time pursuant to a contract between an Indian housing authority for the tribe and the Secretary.
>
> (2) The extent of poverty and economic distress and the number of Indian families within Indian areas of the tribe.
>
> (3) Other objectively measurable conditions as the Secretary and the Indian tribes may specify.

25 U.S.C. § 4152(b). The regulation, 24 C.F.R. § 1000.318, in turn provided in relevant part, as follows:

> When do units under Formula Current Assisted Stock cease to be counted or expire from the inventory used for the formula?
>
> (a) [Housing] units shall no longer be considered Formula Current Assisted Stock when the Indian tribe, [tribally designated housing entity], or [Indian Housing Authority] no longer has the legal right to own, operate, or maintain the unit, whether such right is lost by conveyance, demolition, or otherwise, provided that:
>
> > (1) Conveyance of each [housing] unit occurs as soon as practicable after a unit becomes eligible for conveyance by

the terms of the [Mutual Help Occupancy Agreement]; and

(2) The Indian tribe, [tribally designated housing entity], or [Indian Housing Authority] actively enforce strict compliance by the homebuyer with the terms and conditions of the [Mutual Help Occupancy Agreement], including the requirements for full and timely payment.

24 C.F.R. § 1000.318.

A.

In plaintiffs' view, the statutory language of Section 4152(b)(1) is plain and unambiguous: HUD is required to include in the allocation formula all of the housing units owned and operated by a tribe as of September 30, 1997, without exception.[8] This first factor, plaintiffs maintain, was intended by Congress to provide a base amount of funding, founded upon a definitive number of housing units on a date certain, upon which tribes could rely to implement their affordable housing activities (described by the district court in Fort Peck I as a funding "floor," 435 F. Supp. 2d at 1132). Plaintiffs contend that HUD's disqualification of such units under 24 C.F.R. § 1000.318 violated Congress's expressed intent in Section 4152(b)(1) and thus the regulation is unlawful.

In support of their argument, plaintiffs contend that Section 4152(b)(1), in contrast to the more general factors laid out in Sections 4152(b)(2) and (3), leaves no

[8] The parties each take the position in their briefs that the phrase "at the time" in Section 4152(b)(1) refers to September 30, 1997, immediately prior to the October 1, 1997, effective date of NAHASDA. Although it is clear that HUD, like the parties, equated the phrase "at the time" with September 30, 1997, in promulgating the regulations (see, e.g., 24 C.F.R. § 1000.312, defining current assisted stock as all housing units "under management as of September 30, 1997"; 24 C.F.R. § 1000.322, providing that units "not owned or operated at the time (September 30, 1997)" are not included in FCAS), it is not clear to the court that this interpretation is the correct one. As defendant acknowledged at oral argument, an equally plausible, if not preferable, interpretation of the phrase "at the time" could be that the formula shall "be based on . . . units owned or operated at the time" the formula is applied, i.e., on an annual basis. Under such an interpretation, a yearly adjustment in the FCAS calculation to account for housing units no longer owned or operated by a tribe would clearly comport with Section 4152(b)(1). As the parties have neither taken this position nor briefed the issue, however, the court declines to pursue it further here.

room for the exercise of agency discretion. In particular, plaintiffs point out that Section 4152(b)(1) directs that the allocation formula "shall be based on . . . [t]he number of low-income housing dwelling units" for which a tribe was receiving federal assistance when NAHASDA went into effect. In plaintiffs' view, the meaning of the phrase "based on," when coupled with a definitive number, is clear: the statute mandates that the allocation formula must include all of the housing units identified in the text of Section 4152(b)(1). Nuclear Energy Inst., Inc. v. EPA, 373 F.3d 1251, 1269 (D.C. Cir. 2004) (citing Natural Res. Def. Council, Inc. v. Daley, 209 F.3d 747, 753–54 (D.C. Cir. 2000)). Plaintiffs thus urge the court to adopt the conclusion reached by the district court in Fort Peck I—because "[t]he statute leaves no room for the formula to include some, but not all of the number of housing units" identified in Section 4152(b)(1), Section 1000.318 is inconsistent with the statutory directive and is therefore invalid. 435 F. Supp. 2d at 1132.

Nor, in plaintiffs' view, is the invalidity of the regulation remedied by characterizing the challenged formula as starting with the number of housing units identified in Section 4152(b)(1), but then going on to make adjustments to that number pursuant to Section 4152(b)(3). Plaintiffs argue that such an approach—the one endorsed by the Tenth Circuit in Fort Peck II, 367 F. App'x at 891—impermissibly elevates a more general catch-all factor over the more specific factor in Section 4152(b)(1), and unlawfully allows HUD to make formula allocation decisions without considering each of the congressional mandated factors in full. See, e.g., RadLAX Gateway Hotel, LLC v. Amalgamated Bank, ____ U.S. ____, 132 S. Ct. 2065, 2071 (2012) (quoting with approval the proposition that "the specific governs the general," "particularly when the two are interrelated and closely positioned, both in fact being parts of [the same statutory scheme]") (internal citations omitted); Woodall v. Federal Bureau of Prisons, 432 F.3d 235, 247 (3d Cir. 2005) (invalidating a Bureau of Prisons regulation that allowed the agency to make transfer decisions without considering all of the factors explicitly enumerated for consideration in the statute).

In further support of their assertion that 24 C.F.R. § 1000.318 violated the original terms of NAHASDA, plaintiffs refer the court to the 2008 Reauthorization Act, amending Section 4152(b)(1) to allow HUD to remove certain units from the FCAS component of the allocation formula going forward. In plaintiffs' view, both the circumstances surrounding the enactment of the amendments and the text of the amendments themselves confirm that the Reauthorization Act represents a substantive change from the earlier version of the statute—one designed to reconcile the illegal regulatory procedure set forth in 24 C.F.R. § 1000.318 with the congressional intent clearly expressed in Section 4152(b)(1). Plaintiffs argue, in other words, that the Reauthorization Act, by incorporating the very regulatory provision found to be invalid by the court in Fort Peck I, leaves no doubt that 24 C.F.R. § 1000.318 was inconsistent with the congressional mandate under

NAHASDA. 2B Norman J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 49:11, at 145 (7th ed. 2008) (providing that "[w]here a former statute is amended, or a doubtful meaning clarified by subsequent legislation, such amendment or subsequent legislation is strong evidence of the legislative intent of the first statute.").

Plaintiffs' argument on this point begins with the circumstances surrounding the passage of the 2008 amendments. According to plaintiffs, the proposed amendments were developed by HUD at the request of Congress in response to the district court's decision in Fort Peck I. See Housing Issues in Indian Country: Hearing Before the S. Comm. on Indian Affairs, 110th Cong., at 69–70 (2007). Plaintiffs note that on two separate occasions, HUD representatives, in describing the effect of the proposed amendments, testified before Congress that the amendments would "change the way that housing units . . . are counted for formula purposes" by ceasing to include housing units in the FCAS component in the year after they are conveyed, demolished, or disposed of. Statement of Orlando J. Cabrera, Ass't Sec'y for Pub. & Indian Housing, Hearing Before the H. Comm. on Financial Services Subcomm. on Housing & Community Opportunity, at 3 (June 6, 2007); Statement of Rodger J. Boyd, Deputy Ass't Sec'y for Native American Programs, Hearing Before S. Comm. on Indian Affairs, at 3 (July 9, 2007). Because Congress went on to enact the amendments substantially as proposed by HUD, plaintiffs maintain that the court should accept the agency's representation—that the amendment would "change the way that housing units . . . are counted for formula purposes"—as reflecting congressional intent. 2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 48.10, at 583 (7th ed. 2010) (providing that "if the legislature adopts an amendment urged by a witness [at a committee hearing], it may be assumed that the intent voiced was adopted by the legislature"). Plaintiffs argue, in other words, that by amending the statute as HUD proposed, Congress endorsed HUD's characterization of the amendment as a change in law.

Indeed, plaintiffs maintain that a side-by-side comparison of the pre- and post-amendment versions of Section 4152(b)(1) makes clear that the Reauthorization Act constituted a substantive change in the way that housing units are to be counted under the FCAS component of the allocation formula. Plaintiffs point out that under the pre-amendment version of the statute, Congress defined the first need factor as "[t]he number of low-income housing dwelling units owned or operated at the time pursuant to a contract between an Indian housing authority for the tribe and the Secretary." Section 4152(b)(1). Under the Reauthorization Act, by contrast, Congress defined the first need factor as follows:

> The number of low-income housing dwelling units developed under the United States Housing Act of 1937 (42 U.S.C. 1437 et seq.), pursuant to a contract between an Indian housing authority for the

> tribe and the Secretary, that are owned or operated by a recipient on the October 1 of the calendar year immediately preceding the year for which funds are provided, subject to the condition that such a unit shall not be considered to be a low-income housing dwelling unit for purposes of this section if—
>
> (i) the recipient ceases to possess the legal right to own, operate, or maintain the unit; or
>
> (ii) the unit is lost to the recipient by conveyance, demolition, or other means.

25 U.S.C. § 4152(b)(1)(A). Plaintiffs argue that if the original version of Section 4152(b)(1) did not in fact mandate the inclusion of the 1997 units in the allocation formula, there would have been no need for Congress to amend that section at all. Plaintiffs point out that courts have traditionally held that when Congress acts to amend a statute, the presumption is that Congress "intends its amendment to have real and substantial effect." Pierce Cnty., Wash. v. Guillen, 537 U.S. 129, 145 (2003) (quoting Stone v. INS, 514 U.S. 386, 397 (1995)); S. Corp. v. United States, 690 F.2d 1368, 1374 (Fed. Cir. 1982) (observing that courts do not presume that Congress would perform "a useless act"). In order, then, for the 2008 amendments to have "real and substantial effect," plaintiffs maintain that the Reauthorization Act must be construed as a substantive change in the way that housing units are to be counted for FCAS purposes.

This presumption against such "useless acts" by Congress is particularly applicable, plaintiffs further contend, as it pertains to the Reauthorization Act's civil action provision. 25 U.S.C. § 4152(b)(1)(E) (specifying that the amendments to Section 4152(b)(1) shall not apply to civil actions filed within 45 days of the Reauthorization Act's effective date).[9] In plaintiffs' view, such a provision would not have made sense if the Reauthorization Act had merely clarified existing law; only if the post-amendment version of Section 4152(b)(1) differed substantively from

---

[9] The civil action provision provides in full as follows:

> Subparagraphs (A) through (D) [the statutory changes to the formula allocation provision] shall not apply to any claim arising from a formula current assisted stock calculation or count involving an Indian housing block grant allocation for any fiscal year through fiscal year 2008, if a civil action relating to the claim is filed by not later than 45 days after October 14, 2008.

25 U.S.C. § 4152(b)(1)(E).

the pre-amendment version would Congress have had reason to differentiate explicitly between the two by permitting certain lawsuits to proceed under the pre-amendment version. As the Second Circuit reasoned in Commissioner v. Callahan Realty Corp., 143 F.2d 214, 216 (2nd Cir. 1944):

> Had the intent of Congress been only to state more clearly what the statute had meant from its original enactment, there would have been no point in limiting the effect of the restatement to the period following [the date of the amendment's enactment]. We think such a limitation shows that it did realize that the amendment enlarged the scope of the original enactment and made sure that taxpayers would understand that it was not to be applied retroactively. It is reasonable to believe that Congress was unwilling to impose harsh burdens upon taxpayers based only upon doubtful interpretation of so drastic a statute and preferred to make its meaning clear before it should have such an effect.

Accord, Teledyne, Inc. v. United States, 50 Fed. Cl. 155, 177 (Fed. Cl. 2001), aff'd sub nom. Allegheny Teledyne Inc. v. United States, 316 F.3d 1366 (Fed. Cir. 2003) ("As the Federal Circuit has noted, the fact that an amendment is expressly made prospective leads to the conclusion that the amended language was not intended by the original enactment."). Plaintiffs thus argue that by amending the formula allocation provision of Section 4152(b)(1) to incorporate 24 C.F.R. § 1000.318 and by permitting litigation to be filed under the pre-amendment version of the statute, Congress acknowledged that Section 1000.318 was a "broadening of the original statute involving legislation beyond the power of HUD." Callahan Realty, 143 F.2d at 216. "Until Congress itself amended the statute," in other words, "the regulation went beyond its scope and was invalid." Id.

B.

Defendant, for its part, does not dispute that Congress's intent is clear from the plain statutory language of NAHASDA. Yet, while plaintiffs interpret that language as requiring the 1997 housing units to be included as a mandatory term in the allocation formula, defendant reads the statute instead as requiring HUD to fund all tribal housing projects according to their relative need. In defendant's view, the removal of housing units from the FCAS component under 24 C.F.R. § 1000.318 is consistent with that intent because a tribe's need is reduced when housing units pass out of its ownership or control.

Defendant's argument begins with the text of the pre-amendment Section 4152(b) itself. Defendant points out that this section, by its terms, identifies

the "[f]actors for determination of need" and goes on to identify three allocation formula factors that the statute characterizes as "reflect[ing] the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities." Defendant thus argues that by definition the enumerated factors—(1) the number of housing units under pre-NAHASDA contracts with HUD; (2) the extent of poverty and the number of Indians in the relevant area; and (3) any additional "objectively measurable conditions" specified by the Secretary and the tribes—each speaks to some aspect of tribal need.

In defendant's view, a tribe's current need for affordable housing is primarily reflected in the second factor—"[t]he extent of poverty and economic distress and the number of Indian families within Indian areas of the tribe." 25 U.S.C. § 4152(b)(2). Defendant explains, however, that this factor did not provide the full measure of a tribe's total need in 1997 because it failed to account for the long-term agreements between the tribes and HUD that were entered into under NAHASDA's predecessor statute to fund capital investments and improvements. Because NAHASDA terminated those agreements, defendant maintains that the continued funding of such investments constituted one aspect of a tribe's need, at least until the capital investments at issue were fully funded and/or the units that were the subject of the agreements had been conveyed. That aspect of a tribe's need, defendant asserts, was reflected in the first factor—"[t]he number of low-income housing dwelling units owned or operated at the time pursuant to a contract between an Indian housing authority for the tribe and the Secretary." 25 U.S.C. § 4152(b)(1).[10] Finally defendant argues that Congress conferred on HUD a significant amount of discretion in establishing the allocation formula, as indicated by the very broad third factor—any "[o]ther objectively measurable conditions as the Secretary and the Indian tribes may specify." 25 U.S.C. § 4152(b)(3).

Given this statutory framework, defendant maintains that 24 C.F.R. § 1000.318 is entirely in keeping with the intent of Congress. First, defendant contends that while the number of housing units described in Section 4152(b)(1) reflected the need of Indian tribes for assistance for affordable housing activities in 1997, with each passing year the correlation between that number and tribal need would decrease as housing units were removed from the tribe's inventory. Defendant thus argues that in order for the allocation formula to achieve the overarching intent of the statute—that the allocations be based on the tribes' need—the first factor must

---

[10] See also Statement of Cabrera, at 5 (describing the need-based formula funding allocations as being predicated on two factors: "need, which is the extent of poverty and economic distress and the number of Indian families within the Indian areas of the tribe; and Formula Current Assisted Stock (FCAS), which is the number of dwelling units that are currently owned or operated by the grant recipient that were developed under an Annual Contributions Contract authorized by the 1937 Act").

necessarily be adjusted to reflect changes occurring over time. See, e.g., Fort Peck II, 367 F. App'x at 891 (refusing to interpret Section 4152(b)(1) as prohibiting a reduction in housing units based on a measurable reduction in a tribe's responsibility for those units because such an interpretation is "inconsistent with the statute's plain language and is contrary to Congress's unambiguous intent that the funding formula relate to the needs of all tribal Housing Entities"). Indeed, defendant points out that as the first factor decreases, the second factor, reflecting the ongoing housing needs of the tribes independent of the predecessor statute, becomes predominant, a result that is similarly reflected in the regulations. See Section 1000.324 (indicating that as funds allocated under the FCAS component decrease, more money is allocated under the need component). That approach, defendant asserts, is entirely consistent with the congressional objective of shifting from the pre-NAHASDA scheme to the block-grant concept embodied by NAHASDA. Finally, defendant argues that Section 1000.318's reduction of housing units in the FCAS component fully comports with the broad discretion given to HUD to formulate the terms of the allocation formula. As defendant observed in its brief, "it would be odd for Congress to have granted the Secretary this broad power but denied the Secretary the authority to make reasonable adjustments to one of the factors."

In addition, defendant refutes plaintiffs' contention that the phrase "shall be based on . . . [t]he number" must be construed as including the number of 1997 housing units in the allocation formula without adjustment. Rather, defendant maintains that the allocation formula is "based on" the first factor if the formula uses the number of units under contract in 1997 as the starting point for the calculation, then adjusts that number based on the second and third factors. McDaniel v. Chevron Corp., 203 F.3d 1099, 1111 (9th Cir. 2000) (observing that courts have held that "the plain meaning of 'based on' is synonymous with 'arising from' and ordinarily refers to a 'starting point' or a 'foundation'"); Sierra Club v. EPA, 356 F.3d 296, 306 (D.C. Cir. 2004) (confirming that "results obtained by adjusting the model can still reasonably be described as 'based on' that model"). Defendant thus urges the court to endorse the Tenth Circuit's conclusion in Fort Peck II: because the formula was "based on" the relevant number of homeownership units as one of several "factors" to be considered, the formula complies with the statute. 367 F. App'x at 892.

Nor does defendant accept plaintiffs' contention that the 2008 amendments to NAHASDA represent a change in law and therefore confirm the invalidity of 24 C.F.R. § 1000.318 under the statute as originally written. Defendant maintains instead that the Reauthorization Act merely clarified the statute, an assertion it supports with reference to a 2007 Senate committee report which provided that the proposed amendment "clarifies that conveyed units or other units no longer owned or operated by a grant recipient as affordable housing, including those units the recipient no longer has the legal right to own, operate or maintain, may not be counted in the funding formula." S. Rep. No. 110-238, at 9 (2007) (emphasis added).

In addition, defendant points out that Congress amended NAHASDA several times prior to 2008 without altering 24 C.F.R. § 1000.318,[11] serving, in defendant's view, as a tacit endorsement of the agency's interpretation. Sebelius v. Auburn Reg'l Med. Ctr, ____ U.S. ____, 133 S. Ct. 817, 827 (2013) (concluding that a regulation reflected the interpretation intended by Congress in part because Congress had amended the pertinent statute six times while leaving the agency's regulation in place). Indeed, defendant goes on to suggest that Congress only took up the issue in 2008 to correct what it saw as the erroneous holding in Fort Peck I. In defendant's view, the fact that Congress incorporated the agency's long-standing interpretation into the Reauthorization Act confirms that Section 1000.318 implements congressional intent as expressed in the pre-amendment law. Auburn, 133 S. Ct. at 827–28 (observing that "when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the agency's interpretation is the one intended by Congress") (quoting Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 846 (1986)); Star-Glo Assocs. LP v. United States, 414 F.3d 1349, 1357 (Fed. Cir. 2005) (observing that Congress had approved the agency's prior efforts not by mere acquiescence but by enacting legislation incorporating the agency's interpretation).

C.

In evaluating the correctness of the parties' respective positions, we turn to the Supreme Court's decision in Chevron, USA, Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), the seminal case governing the review of an agency action. Under Chevron, courts are instructed to perform a two-step inquiry in reviewing an agency's construction of a statute that it is charged with administering. First, the court must determine whether "Congress has directly spoken to the precise question at issue." Id. at 842. If so, Chevron counsels that this is the end of the matter: "[T]he court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842–43 If the court determines, however, that Congress has not directly addressed the precise question at issue because the statute is "silent or ambiguous with respect to the specific issue," Chevron sets forth a second inquiry: "whether the agency's answer is based on a permissible construction of the statute." Id.

---

[11] See, e.g., Omnibus Indian Advancement Act, Pub. L. No. 106-568, § 1003, 114 Stat. 2868 (2000); Native American Housing Assistance and Self-Determination Reauthorization Act of 2002, Pub. L. No.107-292, 116 Stat. 2053 (2002); Native American Housing Enhancement Act of 2005, Pub. L. No. 109-136, 119 Stat. 2643 (2005).

In applying the first prong of Chevron, we are unable to conclude that Congress has directly spoken to the precise question at issue, namely, whether housing units owned or operated by the tribes in 1997 must be included in the allocation formula without adjustment. Although Congress identified such housing units as one of three factors on which the allocation formula was to be based, the statute is silent as to how that factor must be incorporated into the formula, or how the relative factors are to be weighed. Indeed, the statute conferred on HUD, working in concert with the tribes, full authority to promulgate regulations, 25 U.S.C. § 4152(a), and permitted the agency to base the allocation formula on any "objectively measurable conditions as the Secretary and the Indian tribes may specify," 25 U.S.C. § 4152(b)(3). Such broad discretion, we believe, indicates Congress's intent to leave such matters up to HUD.

Nor do we believe that the plain language of the statute supports plaintiffs' position. Contrary to plaintiffs' assertion, we do not read the phrase "shall be based on" coupled with a definitive number as necessarily requiring that the number appear unchanged in the final allocation. Although such an interpretation is a possible reading of the statute (as evidenced by the district court's decision in Fort Peck I), it is not an inevitable one. We base our conclusion on several factors.

First, numerous courts, in performing Chevron inquiries similar to ours, have found ambiguity in the phrase "based on." See, e.g., Sierra Club, 356 F.3d at 305–06 (concluding that there was "no question that the phrase 'based on' is ambiguous"). Further, courts have generally refused to give the phrase the absolute meaning urged by plaintiffs, opting instead to interpret the words "based on" as requiring less than a one-to-one correlation. Id. at 306 (concluding that the words "based on" do not necessarily mean "rest solely on"); McDaniel, 203 F.3d at 1111 (observing that the phrase "based on" ordinarily refers to a "starting point" or a "foundation"). Nor do we think the addition of a specific number remedies this ambiguity.[12] The question

---

[12] The cases plaintiffs cite for this proposition—Nuclear Energy, 373 F.3d 1251, and Daley, 209 F.3d 747—are not to the contrary. In Nuclear Energy, 373 F.3d at 1367, the Court of Appeals for the D.C. Circuit took up the question of whether the EPA had complied with a statutory directive requiring it to promulgate a rule "based upon and consistent with" the findings and recommendations of the National Academy of Sciences when the agency adopted a compliance period other than the period recommended by the Academy. Applying the first prong of Chevron, the court found that the phrase "based upon and consistent with" was ambiguous given the precedents in that circuit (including Daley). Id. at 1269. In reaching that conclusion, the court observed that in Daley, the D.C. Circuit had held that statutory language requiring a fishing quota to be "consistent with" a fishery management plan was ambiguous because "[t]he statute does not prescribe a precise quota figure." Id.

(continued...)

before the court is not whether we can discern a particular number indicated by the first factor in Section 4152(b), but whether the statute clearly prohibits the adjustment of that number in the allocation formula. A definitive number does nothing to inform that inquiry.

In addition, we believe that the statutory requirements are satisfied if the resulting formula takes into account each of the three factors in its evaluation of need. The formula is "based on" the three factors, in other words, if the factors are considered in turn, with each factor permitted to balance or offset the others. Indeed, we think the use of the word "factor" itself indicates that Congress simply intended the 1997 housing units to contribute to the formula in some way. See, e.g., Black's Law Dictionary 630 (8th ed. 2004) (defining "factor" as an "agent or cause that contributes to a particular result"); Webster's Third New Int'l Dictionary 813 (1993) (defining "factor" as "something (as an element, circumstance, or influence) that contributes to the production of a result"). As the Tenth Circuit observed in Fort

---

[12](...continued)
(quoting Daley, 209 F.3d at 754).

In both Nuclear Energy and Daley, in other words, the courts held that language comparable to ours—"based upon and consistent with"—was ambiguous under Chevron's first step. Indeed, both courts went on to hold that the challenged agency actions were unreasonable under Chevron's second step because the agency's action in each case "so completely diverges from any realistic meaning of the [statute] that it cannot survive scrutiny under Chevron Step Two." Nuclear Energy, 373 F3d at 1270 (finding that the agency's action could not reasonably be described as being "based upon and consistent with" the Academy's findings and recommendations since the agency had "unabashedly rejected [the Academy's] findings, and then went on to promulgate a dramatically different standard, one that the Academy had expressly rejected"); Daley, 209 F.3d at 753–54 (similarly concluding that a fishing quota set by the National Marine Fisheries Service "so completely diverge[d] from any realistic meaning of the Fishery Act that it cannot survive scrutiny under Chevron's Step Two").

Simply put, then, Nuclear Energy and Daley do not stand for the proposition that the identification of a particular number in a statute is an unambiguous term that may not be altered by regulation. To the contrary, the Nuclear Energy court went so far as to suggest that an agency's action would be found to be reasonable where the agency had taken the statutory recommendations into account and then tailored a standard that accommodated the agency's policy concerns. Nuclear Energy, 373 F.3d at 1269. And in the absence of relevant authority for this proposition, we are unable to conclude that Section 4152(b)(1) unambiguously directs that the 1997 housing units must be incorporated into the allocation formula without adjustment.

Peck II, "NAHASDA clearly required interplay between all three factors in the determination of a Tribal Housing Entity's need, including those HUD identified in the rulemaking process" and "Section 1000.318's downward adjustment [is] an example of this interplay." 367 F. App'x at 892.[13]

In light, then, of both the statutory text and its framework, we are unable to conclude under the first prong of Chevron that NAHASDA unambiguously imposes the limitations on HUD's action that plaintiffs would now have us recognize. What is clear from the statute, however, is that Congress intended the enumerated factors to be reflective of "the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities." 25 U.S.C. § 4152(b). The three factors

---

[13] Nor do we accept plaintiffs' argument that the approach endorsed by defendant and ultimately adopted by the Tenth Circuit—construing FCAS reductions as falling under the "other objectively measurable conditions" language of Section 4152(b)(3), Fort Peck II, 367 F. App'x at 891—impermissibly elevates a more general catch-all factor over the more specific factor in Section 4152(b)(1) and unlawfully allowed HUD to make formula allocation decisions without considering each of the congressionally mandated factors in full (relying on RadLAX, 132 S. Ct. 2065; Woodall, 432 F.3d 235).

As an initial matter, we do not necessarily see adjustments to FCAS as falling under Section 4152(b)(3). Rather, as discussed below, we believe those adjustments are equally permissible under Section 4152(b)(1) itself. But even if we were to characterize Section 1000.318's adjustments as arising under the "other objectively measurable conditions" factor, we do not believe the cases on which plaintiffs rely support their position. In RadLAX, for instance, the Supreme Court was called upon to reconcile two subsections of a statute—a general subsection that appeared to permit an action, with a more specific section prescribing it. RadLAX, 132 S. Ct. at 2071. Faced with that apparent inconsistency, the Court invoked the canon of statutory construction in which the specific governs the general to "avoid[] . . . the superfluity of a specific provision that is swallowed by the general one, 'violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute'"). Id. (internal citation omitted). Here, by contrast, Sections 4152(b)(1) and (3) are not in conflict.

Similarly, in Woodall, 432 F.3d at 250, the Bureau of Prisons was accused of implementing a rule that affected the placement and transfer of prisoners wholly without reference to the considerations governing such decisions set forth in the statute. No comparable claim can be made in our case: the challenged allocation formula does not fail to take into account a statutorily enumerated factor; it merely adjusts that factor according to the tribe's need. RadLAX and Woodall, in other words, are both clearly distinguishable.

set out in Section 4152(b) therefore must be read, foremost if not exclusively, as indicators of need. Accord, United Keetoowah Band of Cherokee Indians v. HUD, 567 F.3d 1235, 1241 (10th Cir 2009) (interpreting Section 4152(b) as "explicitly and unambiguously mandat[ing] that the factors in HUD's allocation formula reflect—in other words, have some connection or nexus with—the needs of Indian tribes and Indian areas of the tribes.") Given this clear congressional mandate, we think the answer to the second Chevron inquiry—whether the agency's interpretation of the statute is reasonable—is plain: 24 C.F.R. § 1000.318, by removing from the FCAS component housing units that are no longer owned or operated by the tribe, fully comports with the expressed intent of Congress that the allocation formula be based on need, and must therefore be upheld as a reasonable construction of the statute.

In reaching this conclusion, we think it is clear that the funding of units no longer owned or operated by a tribe cannot reasonably be construed as related to the tribe's need.[14] As defendant explains, although the 1997 housing units represented one aspect of a tribe's need when NAHASDA was first enacted (to replace funding provided under the previous statutory regime), that unadjusted factor would no longer serve its designated purpose as the years went by if tribes continued to receive funding based on housing units for which they were no longer responsible. Fort Peck II, 367 F. App'x at 892 (characterizing a reduction in FCAS equal to the number of dwelling units no longer owned or operated by a tribe as reflecting the ongoing and evolving needs of the tribe). Recognizing this dilemma, HUD and the tribes, employing the negotiated notice-and-comment rulemaking process specifically designated by Congress, together determined that the 1997 housing units should be removed from the allocation formula when the units ceased to be owned or operated by the tribe. 24 C.F.R. § 1000.318. Given Congress's clear directive that funding allocations be related to tribal need, we believe that determination to be eminently reasonable.[15]

---

[14] Plaintiffs make the case that the permanent inclusion of the 1997 housing units in the allocation formula indeed reflects need by providing a minimum level of funding to account for expenditures not accounted for at the time by the statute (e.g., housing units that had been demolished but replaced). We cannot, however, accept plaintiffs' contention that Congress intended the 1997 housing units to be incorporated into the allocation formula, as a funding floor, without adjustment. As defendant notes, Congress did indeed establish a funding floor to prevent a tribe's allocation from falling too low, but it did so elsewhere in the statute. See 25 U.S.C. § 4152(d). This statutory minimum is detailed and comprehensive and, indeed, reflects both the amount of each annual NAHASDA appropriation and the number of units each tribe owned or operated pursuant to a pre-NAHASDA contract.

[15] This conclusion is especially true since the funds paid under the FCAS (continued...)

Nor do we believe that the 2008 amendments to NAHASDA undermine our conclusion. We read the amendment to Section 4152(b)(1) as essentially adopting the definition of FCAS set forth in Section 1000.318 and, as such, we construe that provision as serving to clarify law made less certain by the district court's decision in Fort Peck I. 1A Norman J. Singer, Sutherland Statutory Construction § 22:29, at 264 (5th ed. 1993) (an "amended statute should be interpreted in light of the court decisions that may have prompted the amendment."). We thus believe that Congress resolved in the government's favor the issue raised here—whether Section 1000.318's removal of units from the FCAS calculation was in violation of congressional intent as originally set forth in NAHASDA.

In reaching this conclusion, we were not persuaded by plaintiffs' characterization of the testimony given by various HUD representatives as confirming that the proposed amendments to the allocation formula represented a change in law. As defendant points out, the statements that the amendments would "change the way that housing units . . . are counted for formula purposes," were made to Congress in 2007, i.e., after the district court's decision in Fort Peck I (holding that HUD could not reduce the number of housing units eligible for inclusion in the allocation formula below the level that the tribe had under contract in 1997), but before the Tenth Circuit's ruling in Fort Peck II (reversing that decision). See, e.g., Statement of Cabrera, at 3; Statement of Boyd, at 3. Defendant thus explains that the characterization of the proposed amendment as a "change" in law referred to a reversal of the precedent established by Fort Peck I, and not, as plaintiffs urge, to a departure from the original statute.[16]

Plaintiffs make a more compelling case with respect to the Reauthorization Act's civil action provision, 25 U.S.C. § 4152(b)(1)(E) (allowing tribes to file suit under the pre-amendment allocation formula provision), but here, too, we must

---

[15](...continued)
component of the formula were not then available for distribution under the need component. 24 C.F.R. § 1000.324.

[16] Plaintiffs maintain that the fact that Fort Peck I had already been decided is irrelevant, as the court had explicitly limited its holding to the Fort Peck Housing Authority and the decision thus had no wider application. Fort Peck I, 435 F. Supp. 2d at 1136. Plaintiffs' position, however, ignores the fact that Congress sought HUD's views on the proper response to Fort Peck I (see Housing Issues in Indian Country: Hearing Before the S. Comm. on Indian Affairs, 110th Cong., at 69–70 (2007)), and further ignores HUD's testimony before Congress that "[t]his change would comport with the process established by the original negotiated rulemaking committee that crafted the [Indian Housing Block Grant] regulations." Statement of Cabrera, at 3; Statement of Boyd, at 3.

ultimately reject their position. In plaintiffs' view, Congress, by enacting the civil action provision, signaled its acknowledgment that the formula allocation provision had been materially changed by the amendment and, by implication, that 24 C.F.R. § 1000.318 therefore violated the statute as originally written. If plaintiffs were correct that the 2008 amendments substantively altered the original statute's treatment of the funding formula, however, there would be no need for a civil action provision: an amendment that substantively changes the law would not in any event be given retroactive application. Landgraf v. USI Film Products, 511 U.S. 244, 265, 269 (1994) (observing that the "the presumption against retroactive legislation is deeply rooted in our jurisprudence" and noting that this presumption applies to "every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past") (internal quotations and citation omitted); Dobbs v. Anthem Blue Cross and Blue Shield, 600 F.3d 1275, 1282 (10th Cir. 2010) (acknowledging that while it is "hazardous . . . to assume from the enactment of a 'clarifying' amendment that Congress necessarily was merely restating the intent of the original enacting Congress, a true clarification applies retrospectively") (internal quotations and citations omitted). As plaintiffs themselves note, an interpretation of a statute that renders it a "useless act" is disfavored. S. Corp., 690 F.2d at 1374; 2B Sutherland § 49:11, at 145.

Even, however, were we to put aside the law's disapproval of retroactive legislation and accept at face value plaintiffs' contention that the civil action provision reflects Congress's understanding that the amended statute represented a change in law, the argument would gain plaintiffs no ground. The difficulty we have with the argument is that it endeavors to establish the meaning of an earlier law by invoking the views of a later Congress—an approach to legislative interpretation that the Supreme Court has in the past described as a "hazardous" undertaking. Waterman S.S. Corp. v. United States, 381 U.S. 252, 269 (1965). It behooves us to remain particularly aware of that caution here, given that the presumed congressional intent that plaintiffs ascribe to the civil action provision—i.e., that it reflects a change in law—is flatly inconsistent with the views expressed by the same Congress in the relevant Senate Report identifying the proposed change in Section 4152(b)(1) simply as a "clarification" of the law. S. Rep. No. 110-238, at 9 (2007). In the final analysis, then, the meaning of a statute must be determined by the courts based upon the plain meaning of the words that the statute employs. As explained above, we see 24 C.F.R. § 1000.318 as a reasonable interpretation of Section 4152(b)(1) prior to the statute's 2008 amendment.[17]

---

[17] There is nothing in the record to indicate why Congress, although it characterized the 2008 amendments as a "clarification" of already existing law, S. Rep. No. 110-238, at 9, nevertheless authorized civil actions to go forward without (continued...)

Plaintiffs argue, however, that even if HUD's interpretation of the statute is found to be reasonable, the court should nevertheless defer to plaintiffs' interpretation based on the canon of statutory construction requiring courts to construe statutes liberally in favor of the Indians and requiring "ambiguous provisions [to be] interpreted to [the tribe's] benefit." Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985); Ramah Navajo Chapter v. Lujan, 112 F.3d 1455, 1461 (10th Cir. 1997). The difficulty we have with plaintiffs' position, however, is that we are unable to see how a canon favoring Native Americans can have any application where, as here, the positions of the various tribes are arguably at odds because increased funding to one tribe may result in decreased funding to another. See, e.g., Fort Peck II, 367 F. App'x at 892 (observing that the cited canon "does not allow a court to rob Peter to pay Paul no matter how well intentioned Paul may be"). Plaintiffs answer this concern by observing that the Tenth Circuit applied the canon favoring Native Americans when interpreting the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 450–458, another zero-sum funding statute upon which NAHASDA was based. Ramah Navajo Chapter v. Salazar, 644 F.3d 1054, 1062 (10th Cir. 2011), aff'd, ____ U.S. ____, 132 S. Ct. 2181, 2193 (2012).

In Salazar, a tribe sued to recover contract support costs to which they claimed entitlement under contracts with HUD. Id. at 1056. The agency defended against the claim in part on the ground that the contracts contained a limitation that the reimbursement of support costs was "subject to the availability of appropriations" and Congress had not appropriated sufficient funds to cover all the contract support costs of the affected tribes. Id. at 1063. The court rejected the agency's argument and found that the tribe was entitled to its full contract support costs—an amount, the court noted, that was to be paid out of the Judgment Fund. Id. at 1076–77.

Thus in Salazar, although the insufficient appropriation by Congress to cover

---

[17](...continued)
reference to that clarification. A possible explanation—suggested by defendant at oral argument—is that Congress did not want to interfere with the numerous cases brought under the prior version of the statute that were already pending before the courts and wanted to give all the tribes an opportunity to be heard in a consistent manner. Callahan, 143 F.2d at 216 (recognizing that Congress may have been unwilling "to impose harsh burdens . . . based only upon doubtful interpretation of so drastic a statute and preferred to make its meaning clear before it should have such an effect"). While defendant's explanation strikes us as being as good as any, to endorse it would be pure speculation. In any event, it is clear that Congress, whatever its motivation in enacting the civil action provision, allowed HUD's interpretation of the statute to prevail going forward, but left open the possibility of the tribes' interpretation prevailing in litigation.

the contract support costs of all the tribes could be described as "a zero-sum game" with respect to the original allocation, id. at 1065, the court's application of the canon favoring Native Americans resulted in the payment of the plaintiff tribe's contract support costs from the Judgment Fund, without a corresponding reduction in the amount any other tribe had received or without adversely affecting any other tribe's entitlement to its entire contract support costs. Following the Tenth Circuit's ruling, in other words, the tribes' interests could no longer be seen as being in conflict and the resolution of their claims no longer a zero-sum game. Here, by contrast, a ruling in plaintiffs' favor theoretically could have resulted in HUD's attempting to recover funds from tribes who had received overpayments under plaintiffs' construction of the statute. The existence of such inimical interests prevents us from characterizing plaintiffs' position as the position of the Native Americans that is due deference. Gila River Indian Community v. United States, Nos. 11-15631, -15633, -15639, -15641, -15642, 2013 WL 2171652, at *19 n.6 (9th Cir. 2013) (observing that the canon of construction requiring a liberal interpretation of statutes in favor of Indians "does not appear to apply when it will benefit one tribe at the expense of other Indian tribes"); Keetoowah, 567 F.3d at 1250 n.6 (declining to apply the canon of construction favoring Native Americans because there are "Native American interests on both sides of the question" and thus "either reading of the statute would benefit Native Americans"). We believe this to be the case even if HUD, as an actual matter, can no longer move against those tribes for recovery. See, e.g., 24 C.F.R. § 1000.319(d) (providing that "HUD shall have 3 years from the date a Formula Response Form is sent out to take action against any recipient that fails to correct or make appropriate changes on that Formula Response Form").

## CONCLUSION

For the reasons set forth above, plaintiffs' motion for partial summary judgment as it relates to the alleged invalidity of 24 C.F.R. § 1000.318 is denied and defendant's cross-motion is granted.

s/John P. Wiese
John P. Wiese
Senior Judge